# MERRICK ET AL. *v.* N. W. HALSEY & COMPANY ET AL., AND THE WEIS FIBRE CONTAINER CORPORATION.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 413. Argued October 16, 17, 1916.—Decided January 22, 1917.

The Michigan "Blue Sky Law," Act No. 46, Public Acts, 1915, p. 63, is the same in principle as the laws of Ohio and South Dakota, involved in *Hall* v. *Geiger-Jones Co., ante,* 539, and *Caldwell* v. *Sioux Falls Stock Yards Co., ante,* 559, and is sustained over constitutional objections for the same reasons.

Whether the dealing in stocks and other securities, or sale of their own issues by corporations, require governmental regulation for the prevention of fraud, and whether such regulation should be by executive control or otherwise, are questions for the state legislature, and unless its judgment in these regards, or the execution of it, be palpably arbitrary, the courts will not interfere.

It is not a function of this court to pass upon the expediency or adequacy of legislation.

The purpose of the Michigan statute is to protect investors in securities not from financial loss generally but from fraud.

In prevention of fraud, the regulatory power of a State is not necessarily confined to those classes of business which by their nature or as generally conducted involve or encourage fraud; it may extend to those in which fraud usually, when it arises, is occasional and

confined to individual transactions, but which may nevertheless be conducted for fraudulent purposes.

The limitations of the Constitution are not so rigid as to render state legislation inadequate to the changing conditions of life.

Section 3 of the Michigan act, which exempts from its operation securities "listed in any standard manual of information" approved by the securities commission, *held*, not to render the act unduly discriminatory or involve unlawful delegation of power.

The act complies with the requirement of the Michigan constitution that no law shall embrace more than one object, which shall be expressed in its title.

228 Fed. Rep. 805, reversed.

THE question in the case is the validity of the Blue Sky Law (using this designation for convenience) of the State of Michigan. The law is almost identical with that of South Dakota, which is the subject of the decision in No. 386, *ante,* 559. The pleadings are elaborate and practically defy synopsis. There are direct complainants and intervening complainants, expressing the grievances of dealers in the State and outside of the State, and of persons who would like to be dealers in the State but are deterred, they allege, by the expense of the undertaking. The law, therefore, is assailed from all points and in all aspects.

The original bill includes in it as parties corporations, individuals, co-partnerships, residents and citizens of different States, all engaged in the investment banking business and in the business of buying and selling stocks, bonds and other securities, and offering them for sale in Michigan and who have contracted from time to time to sell such securities for the owners thereof and for the issuers thereof. They have expended large sums of money in advertising their business and have a valuable good will and an extensive clientele and have acquired valuable information as to the conduct of their business and as to the names and addresses of persons, firms and corporations who buy the designated securities in Michigan. They send into the State their agents and employees, who there

solicit orders for the securities and transmit such orders to complainants, at Chicago, Illinois, which orders are accepted and the securities so purchased are transmitted to Michigan. Their representations of the securities are true representations, they allege, and that they have been solicited to sell and have contracted to sell them, but have been informed that they cannot be permitted to sell them without complying with the Michigan statute.

The various provisions of the statute are set out, with details as to the manner of its operation; the irrelevancy of it is asserted, the useless labor of it—in some cases the impossibility of it—and in other cases its unreasonableness; and it is further asserted that its exaction of matters of confidence and its requirements invade and destroy property rights, curtail freedom of contract and otherwise seriously damage complainants' business and property. All of this is alleged with industrious and elaborate detail.

The other charges of invalidity against the act are: (1) It is in violation of the constitution of Michigan, which provides that no law shall embrace more than one object, which shall be expressed in its title, with specifications. (2) It offends against the Fourteenth Amendment of the Constitution of the United States, especial stress being put upon the exceptions of the statute, which are asserted to be discriminations in violation of the equal protection of the laws guaranteed by that amendment. (3) It imposes a burden on interstate commerce in violation of § 8, Article I, of the Constitution of the United States.

Under the latter objection there is elaborate specification of particulars which exhibit, with the specifications under the other objections, every shade of meaning, purpose or effect that ingenuity can ascribe to the statute—indeed, every provision of the statute is reviewed and charged with some form of illegality. However, the attacks may be condensed in the charge that the statute is a violation of the prohibitions of the Fourteenth Amend-

ment of state action because of its restrictions or prohibitions of a lawful business; and a violation of the commerce clause of the Constitution because the designated securities are articles of commerce and as such entitled to unmolested transportation between the States, and that the statute is a direct burden upon them in many cases, prohibitive in others—with the addition that the statute delegates legislative power to the commission created by it, inflicts cruel and unusual punishments and imposes penalties whose object is to deter from a test of its validity; and inflicts cruel and unusual punishments in violation of the constitution of Michigan.

It is also alleged that in a suit entitled *Alabama & N. O. Transportation Co.* v. *Doyle*, in the District Court for the Eastern District of Michigan, the statute, of which the statute under review is an amendment, was declared unconstitutional and void, the opinion in which case is reported in 210 Fed. Rep. 173, and that the statute there passed upon is similar in all illegal particulars to the present statute. A remedy in equity is asserted because of alleged irreparable injury and on account of the penalties imposed, and an injunction is prayed against the enforcement of the act.

At the same time that the bill outlined above was filed another bill was filed by the Weis Fibre Container Corporation, a corporation of South Dakota, whose purpose is to manufacture, buy and sell paper or fibre containers and similar products. It is not an investment company but a manufacturing company. Its securities are not supervised or regulated by any public service board or commission and the proceeds from the sale of its stocks and securities are employed in the prosecution of its business and are not otherwise invested. The corporation is duly authorized to do business in Michigan; its stock is valuable, and it has offered it for sale in Michigan directly and through agents and employees; and it is alleged that the

representations made in regard thereto are true. It has solicited various persons in Michigan to offer its stock for sale and they have informed it that its stocks cannot be sold in Michigan unless full compliance is made with the statute.

The bill attacks the statute for the illegalities detailed in the other bill and, considering that the only remedy is in equity, prays an injunction against the enforcement of the act.

A restraining order was issued entitled in both cases. Subsequently, on September 16, 1915, a partnership, organized and existing under the laws of the State of Ohio, having the name of Otis & Company and composed of citizens of Colorado and Ohio, filed a petition in intervention.

That company is a dealer in bonds and other securities in Michigan and such bonds and securities are of the kind which the statute of the State regulates. It also sends agents into the State to solicit orders for such securities and transmits orders to its offices in Cleveland, Ohio.

It asserts identity of situation with the complainants in the other bills and adopts their charges against the statute and prays to be made a party complainant to the cause and for the benefit of the restraining order issued therein and for such other relief as the court may deem meet.

A demurrer was filed to the bills and a motion made for injunction. The company was given the benefit of the restraining order and a like benefit was given to all others who might petition to intervene, the restraining order to continue until the disposition of the motion which had been made for injunction. The injunction was subsequently granted (228 Fed. Rep. 805) and to review it this appeal is prosecuted.

There was a partnership under the name of Remick, Hodges & Company, Remick and Hodges being residents of New York and March a resident of New Jersey, having their office at the City of New York and engaged in buying

and selling stocks, bonds and other securities. Their business is known as investment banking and is carried on in New York and by their agents there and elsewhere and by mail with various corporations, associations and persons throughout the United States and in the State of Michigan. They own many of such securities which they have offered and are offering for sale and desire to continue to offer to their customers in the State of Michigan. They have no place of business in the State and are not at the present time sending agents into the State but are endeavoring to sell securities there; but the volume of such business is not sufficient to justify them to attempt to comply with the statute of the State and the statute, if enforced against them, will have the effect of preventing them from making any further offers in the State and from attempting to establish or develop any business therein, and they are excluded thereby from interstate commerce in such securities which they have heretofore enjoyed.

They allege themselves to be in like situation with complainants and adopt the allegations of complainants' bills, and especially complain of the penalties which may be enforced against them and their agents and pray to come into the suit as parties.

The causes were subsequently consolidated by a *nunc pro tunc* order.

The injunctions restrained the defendants from enforcing the act and from beginning or instituting any action, civil or criminal, against complainants "based upon or pursuant to such act."

*Mr. Grant Fellows,* Attorney General of the State of Michigan, for appellants.

*Mr. George W. Wickersham* and *Mr. Robert R. Reed,* with whom *Mr. Charles K. Allen* was on the briefs, for

appellees other than the Weis Fibre Container Corporation *et al.:*

One who "in the course of continued or successive transactions of a similar nature" offers or sells stocks, bonds or other securities owned by him, cannot be prohibited from continuing such "business" except under executive license, subject to revocation. In its every act and aspect, the business represents simply a varying number of transactions, each of which is an individual transaction and a matter of individual right. This business, and the issuing of stocks and bonds by corporations, is no more "affected by a public interest" than the business of buying and selling groceries. *Alabama & N. O. Transportation Co.* v. *Doyle,* 210 Fed. Rep. 173, 179. The professed aim of "blue-sky" legislation is to eliminate the "get-rich-quick" fakirs. The present act by its terms is directed against the great normal business and the bulk of individual transactions involving the sale and re-sale of outstanding securities amounting to billions of dollars in amount. No effort whatever has been made to confine its operation to securities involving elements suggestive of fraud and danger. It includes the "get-rich-quick" promoter in the same way that an act directed against the purchase and sale of any wearing apparel would include the street peddler in paper collars.

There has nowhere at any time been any suggestion of any wide-spread fraud in the sale or distribution of so-called investment securities. There are in fact many businesses where fraud is supposed to be more prevalent, including as instances horse trading and the automobile business. In practically every contractual transaction fraud is possible, and its prevention a proper subject for legislative action. If, upon a legislative assumption of the prevalence of fraud in any general business (as distinguished from a limited or special method of doing business) the entire business and the right to carry it on may

be made the subject of discretionary executive license, then no business can be judicially protected from the assertion of this power.

So far as we have been able to discover, no case has ever reached this court where the power of executive license was asserted except against a business clearly subject to the power of prohibition. Many such cases have, however, been before the state courts and the acts held unconstitutional. *People* v. *Berrien*, 124 Michigan, 664, 666; *People* v. *Warden*, 157 N. Y. 116, 123; *People* v. *Jenkins*, 202 N. Y. 53, 57; *Chaddock* v. *Day*, 75 Michigan, 527; *Lochner* v. *New York*, 198 U. S. 45, 63; *Bessette* v. *People*, 193 Illinois, 334.

In a special sense "police power" relates only to "great public needs," represented by "public peace, health, morals and safety." The term has also been more broadly used as synonymous with governmental power. Its use in the different classes of cases by no means implies that legislation to promote the public convenience may authorize the executive to seize the person or property of the individual in the same way as is permitted to legislation relating to public health; nor, that legislation to prevent fraud in individual transactions of purchase and sale may take the form of subjecting the right to engage in such transactions to discretionary executive license. In *Powell* v. *Pennsylvania*, 127 U. S. 678, the act was rested primarily on the protection of the public health. See also *Plumley* v. *Massachusetts*, 155 U. S. 461. *Rast* v. *Van Deman*, 240 U. S. 342, dealt with a prohibition of a particular and novel method of doing business, conceivably pregnant with a special danger to the public. In the present case we have a prohibition of an entire business consisting primarily of a succession of normal individual transactions. The right is asserted, not to prohibit specific methods of carrying on this business nor of requiring specific safeguards against fraud, but of prohibiting the

whole business, unless in the first instance the right to engage in it is granted by an administrative officer or board upon its determination of the essentially administrative question as to the character of the individual.

Unless we start with the proposition that the right to sell securities owned by individuals as a business is not an inherent right, it is difficult to conceive of any other principle upon which such power may be upheld. The determination as to the character of the individual must be essentially an individual determination of the particular officer or board. It applies not alone against local dealers known in the community, but against dealers of other States and remote cities. Once such a jurisdiction is held to be legally vested in an administrative officer, its exercise becomes potentially arbitrary beyond the power of real protection in the courts—a power of complete control over a business which is essentially individual and competitive. Such a power once asserted and exercised is bound to destroy the normal interstate business in the sale of securities.

Leaving aside some of the smaller and exceptional classes of business and local nuisances subject to municipal regulation, and dealing with the important businesses which have been held subject to discretionary administrative control, such as the railroads, banks, insurance, and liquor business, it is, we believe, correct to say that they are subject to complete power of prohibition against the individual; that they may be confined to corporations; and that they may be taken over and operated by the State. Each is susceptible to administrative control, and if necessary of complete ownership and operation by the State.

The business of dealing in the stocks and bonds of corporations is not within the principle laid down in *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389, and the cases upon which it was decided. *Munn* v. *Illinois*, 94

U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *Brass* v. *Stoeser*, 153 U. S. 391; *People* v. *Budd*, 117 N. Y. 1, 27. The facts submitted in the present case show that there is no mature universal sense of the people regarding the regulation of the sales of stocks and bonds. The legislation flared up suddenly under popular agitation and has died down as rapidly. An equally widespread clamor easily might be cultivated regarding the management of department stores, or of any of the other manifold activities of business life which the Constitution and free institutions protect from the meddlesome interference of governmental bureaucracy. See *American Surety Co.* v. *Shallenberger*, 183 Fed. Rep. 636, 639; *German Alliance Insurance Co.* v. *Barnes*, 189 Fed. Rep. 769, 778; *German Alliance Insurance Co.* v. *Hale*, 219 U. S. 307.

The prohibition against making a particular offering or sale except upon a "certificate of authority" from a state commission is invalid. Even though a fraudulent intent cannot justly be ascribed to the promoter, yet if in the opinion of the commission he has deceived himself and is deceiving others as to the merits and prospects of his scheme, which is in its opinion unsafe, then it would in its opinion "work a fraud on the purchaser," deceive him and cause him loss. This deception and this loss, though unintended, the act plans to prevent. This is the crux of the act. The purpose is to protect a minority of "investors," looking for vast gains, against a danger existing in a small minority of transactions. It prohibits a hundred transactions, because, one of them may be fraudulent, and compels the ninety-nine innocent parties to get a permit and pay a fee, and to establish their honesty and the sound basis of their proposition before they can sell a share of stock. Where not completely prohibitive in the first instance, it will become so as to any normal offering of investment securities the moment the commission exercises its uncontrolled discretion of conducting an ex-

tended investigation of the property and business at the expense of the applicant.

Dealing with the substance, we have a delegation of complete power, including the legislative and the judicial. The thing prohibited is not fraud. It is the transaction. It is made a matter of license, instead of a matter of right without a license. A whole field of ordinary legislation is abandoned to the actual government and control of an administrative commission. This field is the prevention of fraud or improvidence in the sale or purchase of securities.

This deprives the person both of liberty and property without due process of law. It is not within the police power. *Chicago* v. *Netcher*, 183 Illinois, 104, 110; *State* v. *Indiana Oil Co.*, 120 Indiana, 575, 583; *People* v. *Jenkins*, 202 N. Y. 53, 57. The case is not like the case of banks, which invite the savings of whole communities and perform quasi-public service. The investments are essentially individual, and the fraud, if practiced, is individual. The losses sustained by fraud, as distinguished from losses due to wide-spread depressions and panics, are individual. The evil in its essence is simply an important one of the many individual wrongs which should be the subject of effective remedial legislation. See *People* v. *Vandell*, 146 N. Y. Supp. 992, 994.

Over quasi-public businesses and matters of public right, the tendency of modern decisions is to re-assert, rather than to create, the full power necessary to their effective control. There are also, of course, other subjects of prohibition and administrative control, distinct from any business, such as the control over the use of streets and public places, and the far-reaching control necessary at times for the protection of the public health, peace and safety, to which may be added the control over foreign commerce and over aliens which has been vested in the President, and the control given various officials or boards

over governmental agencies, such as the post office, and governmental property, including public parks and reservations. As to each and all of these subjects, the control rests solely on the original principle of necessity on which it was first asserted, and is historically and constitutionally an administrative power, the vesting and conditions of which are subject to law, that is to legislative grant and control. Such control not being legislative in its nature, an act vesting it in an administrator is in no sense a delegation of legislative power. Upon this principle we explain *Lieberman* v. *Van De Carr*, 199 U. S. 552; *Gundling* v. *Chicago*, 177 U. S. 183; *Engel* v. *O'Malley*, 219 U. S. 128; *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389; *Locke's Appeal*, 72 Pa. St. 491; *Field* v. *Clark*, 143 U. S. 649; *Buttfield* v. *Stranahan*, 192 U. S. 470; *Union Bridge Co.* v. *United States*, 204 U. S. 364; *United States* v. *Grimaud*, 220 U. S. 506; *Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194; *Fong Yue Ting* v. *United States*, 149 U. S. 698, and like cases, as distinguished from *Yick Wo* v. *Hopkins*, 118 U. S. 370.

In all these cases, though we think and speak of a delegation of legislative power, it is a vesting of administrative power not within either the letter or spirit of the constitutional rule of prohibition against the delegation of such power. See also *Public Clearing House* v. *Coyne*, 194 U. S. 497; *Ekiu* v. *United States*, 142 U. S. 65, citing *United States* v. *Jung Ah Lung*, 124 U. S. 621. This broad power cannot exist, it cannot be judicially recognized as it has been recognized, if the principle and precedents on which it rests are to be held applicable to the entire field of remedial legislation.

The so-called standard manual feature of the act is unconstitutional and void. The act is utterly unreasonable—an unnecessary and arbitrary interference with private rights, in violation of due process of law. *Gundling* v. *Chicago, supra.* Section 8 prohibits the sale of stock in

Michigan if upon investigation the commission disagrees with the value which has been placed upon the property by the authorities of the issuing State. This and the power given the commission to make detailed examination of investment companies' property and affairs at the expense of such company and to make an appraisal at the like expense of its properties, is utterly unreasonable, and, as applied to the normal business, potentially prohibitive.

The act impairs the freedom of commerce between the States. There would be no question on this point but for the forced construction attempted to be placed upon *Nathan* v. *Louisiana*, 8 How. 73, and *Paul* v. *Virginia*, 8 Wall. 168. So far as the latter case goes, the distinction is plain between a policy of insurance, which is a contract between the parties having nothing to do with interstate commerce, except that the parties may reside in different States, and the case of stocks and bonds as subjects of interstate sale. The former case depended on the right of a State to tax its own citizens for the prosecution of any particular business or profession within the State. It is negligible as applied to the present statute. The interstate sale of securities falls clearly within the opinion of Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, 189. The sale of stocks and bonds when issued and offered for sale by a dealer in New York or Chicago to an investor in Michigan, represents something more than the contract of insurance dealt with in *Paul* v. *Virginia*. It is a "subject of trade and barter offered in the market as something having existence in value independent of the parties to them," that is, of the parties to the transaction of purchase and sale. "They are not commodities," but it is not necessary that a thing be a "commodity" in order to be a subject of sale or commerce. *International Textbook Co.* v. *Pigg*, 217 U. S. 91; *Darnell* v. *Indiana*, 226 U. S. 390; *Lottery Case*, 188 U. S. 321. The attempt to rely upon the inspection cases is hardly serious enough

to require an answer. Generally speaking, a defect in personal property may be discovered by inspection. A fraud in the issuance of sale of stocks cannot be so discovered. What is here attempted is investigation of all questions relating to the soundness of enterprises and values of securities. See *People* v. *Compagnie Gen. Transatlantique,* 107 U. S. 59, 62; *Turner* v. *Maryland,* 107 U. S. 38; *Patapsco Guano Co.* v. *North Carolina,* 171 U. S. 345.

Laws like this have been condemned by fourteen federal judges in the following cases. *Alabama & N. O. Transportation Co.* v. *Doyle,* 210 Fed. Rep. 173; *Compton Co.* v. *Allen,* 216 Fed. Rep. 537; *Bracey* v. *Darst,* 218 Fed. Rep. 482; *Sioux Falls Stock Yards Co.* v. *Caldwell* (before this court), 230 Fed. Rep. 236; *Halsey & Co.* v. *Merrick* (this case), 228 Fed. Rep. 805; *Sater* v. *Hollister* (before this court), 230 Fed. Rep. 233.

Nowhere in the lower federal courts or in the supreme court of any of the States has there been any dissent by even a single judge to the principle announced in the first Michigan case, holding the act void as applied to ordinary dealers in investment securities.

*Mr. Hal H. Smith* filed a brief for the Weis Fibre Container Corporation *et al.,* appellees:

The regulation of the dealer and his calling is incidental to the main purpose of the act which is the regulation and prohibition, unless in compliance with the act, of the issue of stock and bonds by corporations and the making of loans in certain forms by individuals, co-partnerships and associations. The burden of the law falls somewhat upon the dealer but its heaviest load rests upon the issuer of the stocks, bonds or securities and the issuer may be any person, corporate or otherwise, engaged in any business whatever, except only the exempted classes.

The issue and sale of securities is a part of the freedom

guaranteed by the Fourteenth Amendment to the Federal Constitution and by the constitution of Michigan. It is in effect the making of contracts "proper, necessary and essential" to the pursuit of lawful livelihoods or avocations. *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Kuhn* v. *Detroit,* 70 Michigan, 537; *Valentine* v. *Circuit Judge,* 124 Michigan, 664.

The right to issue stock, to execute bonds and to secure their payment by the pledge of property is of no value unless the stock and bonds can thereafter be negotiated. This the law prevents except under heavy restrictions.

The law lays its burden not only upon the specific transaction and the particular investment company. By its sweeping definition of investment companies, it regulates all manner of business enterprises and all kinds of manufacturing and mercantile pursuits. *Moredock* v. *Kirby,* 118 Fed. Rep. 180; *Valentine* v. *Circuit Judge, supra.*

The purpose of the statute is not to regulate fraud, but rather to prevent financial loss. But even if it were otherwise, regulation of all business for the purpose of reaching the occasional fraud is clearly not justified. The fraud must be a necessary incident to the particular business, or the business must lend itself with peculiar ease to deception, else the business cannot be regulated—only the fraud. *Tyroler* v. *Warden,* 157 N. Y. 116.

This law subjects to the commission's authority all secured commercial paper. It regulates the issue and sale of corporate securities. To say now that all corporate business and these securities are so frequently the vehicles of fraud and lend themselves so easily to deception that their entire issue and all their sale must be regulated as this law regulates them, is to declare the very basis of modern business to be fraudulent. *Valentine* v. *Circuit Judge, supra.*

The court has power to determine for itself that no necessity exists for this statute. *People* v. *Smith,* 108 Michi-

gan, 527. We insist that its very basis is "unreasonable and purely arbitrary." *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342. Even if some law would be justified, we submit that the restrictions and burdens of this one do arbitrarily and unnecessarily interfere with constitutional rights; it absolutely suspends the issue, negotiation and sale of the securities for a period limited only by the whim of the commission. The provision of § 8 for an appraisal is another requirement so unreasonable and drastic as to be beyond the power of the State.

The requirement that all foreign investment companies must consent to the jurisdiction of all the courts of the State is another unreasonable restriction. It is settled that a corporation cannot be required so to submit itself. *Sioux Remedy Co.* v. *Cope*, 235 U. S. 197; *Buck Stove & Range Co.* v. *Vickers*, 226 U. S. 205. It violates the constitutional right of nonresident individuals by depriving them of the immunity allowed to citizens of this State, since citizens of Michigan must be sued by personal service. *Moredock* v. *Kirby, supra; Caldwell* v. *Armour*, 1 Penn. (Del.) 545; see 9 Fed. Statutes Ann., p. 176.

The law cannot be defended as a licensing law. It deals with individual transactions. A new application must be made on each new security. The test of the permission is not the character of the dealer or his solvency. It is the character of the security. The dealer is not licensed. The dealer who is licensed can only sell approved securities.

Nor is it an inspection statute. *People* v. *Compagnie Gen. Transatlantique*, 107 U. S. 59; *Sligh* v. *Kirkwood*, 237 U. S. 52, 59, and other cases.

The act is in conflict with the commerce clause; vests arbitrary power in the commission; its title covers more than one subject, and does not express the object, in violation of § 21, Article 5, of the Michigan constitution; it is class legislation; delegates legislative authority; and

attempts to confer judicial powers, in violation of the Michigan constitution.

*Mr. George Cosson,* Attorney General of the State of Iowa, and *Mr. Walter C. Owen,* Attorney General of the State of Wisconsin, by leave of court, filed a brief as *amici curiæ* on behalf of the National Association of Attorneys General of the United States.

Mr. Justice McKenna, after stating the case as above, delivered the opinion of the court.

The statute of Michigan is the same as the statutes of South Dakota and Ohio, and our reply to the attacks made upon it might be rested upon our discussion of those statutes.

But in the present case, as we have said elsewhere, the arguments, while fundamentally the same, are in some respects more circumstantial. All the supposed consequences of the law are dilated upon—wherein, as it is contended, it meddles with or burdens a business asserted to be legitimate, wherein it prohibits or gives power to an executive officer to arbitrarily prohibit such business, and wherein it confuses legislative and executive powers, and in these ways and other ways, as it is further contended, transgresses the Constitution of the United States. Many cases are cited to support the contentions and publicists are avouched to the same end. In our discussion we cannot be as elaborate in details as counsel, nor is it necessary. There are certain outside propositions upon which all others may be regarded as dependent. These propositions were considered in the other cases and we need now only supplement what was there said.

The appellants justify the law by the police power of the State and its comprehensive reach. Replying, appellees urge against it the limitations of the Fourteenth Amend-

ment and the national supremacy over interstate commerce; and applying the Fourteenth Amendment, assert in many ways (we select one and upon it the changes are rung) that the issue of the securities "is in effect the making of contracts 'proper and necessary and essential' to the pursuit of lawful livelihoods or avocations," and cannot be "made the subject of discretionary executive license," controlling thereby individual transactions.

The assertion encounters immediately many cases in which laws have been sustained limiting the making of contracts and regulating business through executive agencies and necessarily controlling individual transactions. Indeed, there are too many for even marginal citation. They, however, are attempted to be distinguished or restricted. It is said by counsel that they "deal with administrative control over matters of public right or public grant or existing at public sufferance." And it is admitted that "the Legislature may deal drastically with many matters of private right, to prevent or redress individual wrongs." It is further admitted that "drastic remedies may be prescribed *by law* [italics ours] for evils deemed by the Legislature to require them." Excluding the proposition so expressed from application to the Michigan law, it is insisted that the business to which it applies "neither requires nor justifies, nor is susceptible of, administrative or executive control for the purpose of preventing a wrong or injury by one individual to another." Of course, the implication, if not the direct assertion, is that the business of dealing in securities has not that character. Neither the principle nor the assertion is very tangible. The first incidence of any evil from a business or conduct is upon some individual and through the individual (let us say individuals, for necessarily there are more than one) upon the community, nor can it be affected in any other way. Besides, it is for the State to judge in such circumstances and the judgment and its

execution would have to be palpably arbitrary to justify the interference of the courts. Counsel, indeed, frankly concedes the evil of "get-rich-quick" schemes and quotes the banking commissioner of the State of Kansas for the statement that the "Blue Sky" law of that State had saved the people of the State $6,000,000 since its enactment and that between 1400 and 1500 companies had been investigated by the department and less than 400 of the number granted permits to sell securities in the State. Counsel also quotes the confidence of the commissioner in the efficacy of the law and that it will "eventually result in the regulation and supervision of all kinds of companies in the same manner as banks are now regulated and supervised."

Against this statement, however, counsel cites the view expressed by the British Board of Trade of the inexpediency of an official investigation "into the soundness, good faith, and prospects" of companies. Upon this difference in views we are not called upon to express an opinion for, as we have said, the judgment is for the State to make, and in the belief of evils and the necessity for their remedy and the manner of their remedy the State has determined that the business of dealing in securities shall have administrative supervision, and 26 States have expressed like judgments.

Much may be said against these judgments, as much has been said, and decisions of the courts have been cited against them. We are not insensible to the strength of both, but we cannot stay the hands of government upon a consideration of the impolicy of its legislation. Every new regulation of business or conduct meets challenge and, of course, must sustain itself against challenge and the limitations that the Constitution imposes. But it is to be borne in mind that the policy of a State and its expression in laws must vary with circumstances. And this capacity for growth and adaptation we said, through Mr. Justice

Matthews, in *Hurtado* v. *California*, 110 U. S. 516, 530, is the "peculiar boast and excellence of the common law." It may be that constitutional law must have a more fixed quality than customary law, or, as was said by Mr. Justice Brewer, in *Muller* v. *Oregon*, 208 U. S. 412, 420, that "it is the peculiar value of a written constitution that it places in unchanging form limitations upon legislative action." This, however, does not mean that the form is so rigid as to make government inadequate to the changing conditions of life, preventing its exertion except by amendments to the organic law. We may feel the difficulties of the new applications which are invoked, the strength of the contentions and the arguments which support or oppose them, but our surest recourse is in what has been done, and in the pending case we have analogies if not exact examples to guide us. So guided and so informed, we think the statute under review is within the power of the State. It burdens honest business, it is true, but burdens it only that under its forms dishonest business may not be done. This manifestly cannot be accomplished by mere declaration; there must be conditions imposed and provision made for their performance. Expense may thereby be caused and inconvenience, but to arrest the power of the State by such considerations would make it impotent to discharge its function. It costs something to be governed.

But counsel say that the conditions imposed either are not adequate to such purpose or transcend what is necessary for it. Indeed, it is asserted that the statute has not that purpose, "but rather to prevent financial loss." The assertion is against the declaration of the title of the statute and against the words of its body, and cannot be justified by assigning to it the purpose of the law which it amends; nor can we assent to the contention that such purpose must be inferred from § 8 or other provisions which point, it is said, to the probability of financial loss, not fraud. The act must be considered from its declared

purpose and as a whole, not from detached portions which can be easily overwhelmed when assigned a false character.

It is, however, said that, assuming the statute have such purpose, the fraud referred to is not a proper object for the police power, and it is asked, "Can the occasional fraud, that fraud which arises in the individual transaction, justify a law regulating the business of which the single transaction is a part? Or must it be fraud which is incidental to the business, a fraud which the business itself, from its character and the manner in which it is generally conducted, invites and encourages?" And, quoting from *People ex rel. Tyroler* v. *Warden*, 157 N. Y. 116, 123, "It is a novel legislation indeed that attempts to take away from all the people the right to conduct a business because there are wrongdoers in it." To the latter we say the right to do business is not taken away; the other we have already answered and need only add that we cannot upon such considerations limit the power of the State. The State must adapt its legislation to evils as they appear and is not helpless because of their forms.

*Engel* v. *O'Malley*, 219 U. S. 128, was not decided because fraud was incidental to the business of banking by individuals or partnerships but because fraud could be practiced in it and that hence it could be licensed. Nor was it decided in *Allen* v. *Riley*, 203 U. S. 347, that the transfer of patent rights was of itself illegal or that any particular transfer would be deceptive, but that some transfers might be; and so a statute of Kansas which required any person selling or offering to sell such rights to conform to certain requirements was declared valid. Nor did we hesitate to hold valid the regulation of the business of employment agencies. It was a lawful business and would not in instances be injuriously conducted; but in instances it might be, and because it might be, with injurious consequences, its regulation was provided. This court sus-

tained the regulation and the condition that it was to be enforced according to the legal discretion of a commissioner. *Brazee* v. *Michigan,* 241 U. S. 340. See also *Brodnax* v. *Missouri,* 219 U. S. 285. Other cases might be cited of similar import.

It may be that there are better ways to meet the evils at which the statute is directed and counsel have felt it incumbent upon them to suggest a better way. We can only reply that it is not our function to decide between measures and upon a comparison of their utility and adequacy determine their legality.

The contentions upon the discriminations of the statute we rest upon the comment made on like contentions in the other cases. A special emphasis, however, is put by appellees upon the adoption by the commission of "so-called 'standard manuals of investment.'" The adoption of these manuals, it is said, is justified by the commission under § 3 which enumerates the securities that are exempt from the law, among others, "(h) securities which are listed in any standard manual of information approved by said commission." The provision is attacked as "'the Michigan idea' of providing an easy way out of the act at all times." And further, "It is not so much an exemption of existing standard securities as a working exemption available for new offerings to be listed as issued." And again, "It is to be a permanent means of exempting new securities from the act." Even this, it is asserted, is not all of the power that is given for discrimination, for it is pointed out that the commission may call for additional information than that contained in the manuals and may, pending the filing of the information, suspend the sale of the securities and may also suspend, either temporarily or permanently, the sale of any securities listed in such manuals after a hearing upon notice, if the commission shall find that the sale of such securities would work a fraud upon the purchasers thereof.

The exemption and the provision are declared to be unconstitutional and it seems to be intimated that in the flexibility of what is considered their subterfuge a vicious character is not only given to the act but constituted its inducement, and therefore brings the act down with it, for without it, it is insisted, the statute would not have been enacted. We cannot agree either to the characterization of the provision or its effect. The first would attribute a sinister purpose to the legislation of which there is no indication, the second would give too much importance to a subordinate provision, one that is only ancillary or convenient to the main purpose.

The contentions based on the exemption and provision are a part of that which accuses the law of conferring arbitrary discretion upon the commission and committing to its will the existence or extinction of the business. The accusation is formidable in words but it is the same that has been made many times. It is answered by the comment and the cases cited in the opinion in the other cases. Besides, we repeat, there is a presumption against wanton action by the commission, and if there should be such disregard of duty a remedy in the courts is explicitly given, and if it were not given it would necessarily be implied.

Objection is made that the title of the act does not indicate its provisions and that the act hence violates the constitution of Michigan. The objection is untenable and does not call for particular notice.

Answer to the contention that the statute is an interference with interstate commerce we leave to our opinion in Nos. 438, 439 and 440, *ante*, 539.

*Decree reversed and cause remanded for further proceedings in conformity with this opinion.*

MR. JUSTICE McREYNOLDS dissents.