FRED J SCHWAEMMLE CONSTRUCTION COMPANY v
DEPARTMENT OF COMMERCE, CORPORATION AND
SECURITIES BUREAU

Docket No. 68656. Argued March 6, 1984 (Calendar No. 1).—Decided
December 28, 1984.

Fred J. Schwaemmle Construction Company petitioned the Corpo-
ration and Securities Bureau of the Department of Commerce
for the release of certain funds being held in escrow in connec-
tion with the sale of limited partnership interests in Foote
Hills Associates so that payments owed Schwaemmle, as gen-
eral contractor, for construction work on an apartment com-
plex financed by Foote Hills, could be paid by the partnership.
Following a hearing, the bureau ordered the release of the
funds to the partners-investors. The Ingham Circuit Court, Ray
C. Hotchkiss, J., reversed on the ground that the partners had
waived their rights to the funds when they agreed to amend
the partnership agreement to allow the funds to be paid toward
the actual costs of completing the project. The Court of Ap-
peals, Beasley, P.J., and M. J. Kelly and Baguley, JJ., reversed,
holding that the bureau was authorized to impose conditions
with respect to the escrow agreement, that the terms of the
bureau's order, the registration statement, and the Uniform
Securities Act prevented the amendment, and that there was
no evidence that the partners actually knew that the amend-
ment was designed to alter their rights (Docket No. 51881). The
plaintiffs appeal.

In an opinion by Justice Cavanagh, joined by Justices Kav-
anagh, Levin, Ryan, Brickley, and Boyle, the Supreme Court
*held:*

The Corporation and Securities Bureau does not have the
authority to impose conditions concerning the disbursement of
funds acquired from the sale of a registered security beyond the
condition that funds be impounded until the issuer of the
security receives a specified amount from the sale.

1. No security may be sold in Michigan unless it is registered

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 37 Am Jur 2d, Fraud and Deceit § 218.
69 Am Jur 2d, Securities Regulation—State §§ 29, 95 *et seq.*

as required by the Uniform Securities Act. As a condition of registration by qualification, the administrator of the bureau may require that the proceeds from the sale of the security be impounded until the issuer receives a specific amount from the sale and may determine the conditions of the impoundment. The purpose of the provision is to ensure that the issuer has sold a significant portion of the security offered and has raised sufficient financial resources before a project to be financed by the sale is commenced and the proceeds of the sale are expended. The administrator may include stipulated requirements as conditions of the impoundment as long as they are intended to operate before the specified amount is collected. However, the stipulations cannot authorize continued impoundment or return of the proceeds once the issuer sufficiently demonstrates that he has deposited the requisite amount in escrow and otherwise has complied with the securities act.

2. In this case, the attempted amendment of the disbursement schedule subsequent to the sale of the limited partnership interests was totally unrelated to the issuance, offer, sale, or purchase of these interests. Fraud in the issuance, offer, sale, or purchase of the securities was never alleged, and it is undisputed that the securities were properly registered and sold. The bureau, by deciding the waiver issue, in effect treated this case as a continuing sale and purchase. The Legislature never intended that the bureau be involved, under the guise of the securities act, in the internal affairs of a corporation or partnership once the sale of securities has been successfully and properly completed. Blue sky laws are not intended to protect investors from financial loss in general, but from fraud which may lead to financial loss.

3. The parties were prevented from litigating all of their equitable and legal arguments concerning the validity of the waiver. The hearing officer correctly ruled that creditor claims were outside the scope of this case and beyond his jurisdiction to decide, limiting his decision to whether the waiver was valid under the securities act and the related regulations and preventing the parties from raising the estoppel arguments and statutory defenses which they subsequently asserted on appeal. These arguments could not have been properly decided by the circuit court because its jurisdiction was limited to an appellate review of the bureau's decision and, in fact, the circuit court specifically denied intervening defendants' motion to offer additional evidence on these claims. Since these claims may be dispositive, the record is inadequate, and no lower court has

ruled on the merits, they cannot be decided by the Supreme Court.

4. The condition in the bureau's order that bureau approval was required before any changes relative to the sale of the securities could be made pertained only to changes made while the securities were being offered and sold. The attempted amendment of the partnership agreement did not violate the Uniform Securities Act. The amendment did not purport to waive compliance with any statutory, regulatory, or order provision. Since the disbursement schedule of the escrow agreement should not have been incorporated in the bureau's order, the amendment could not have conflicted with the bureau's rules or order.

Reversed and remanded.

Chief Justice Williams, concurring, wrote separately to lend further support to the conclusion that the administrator cannot impose conditions on impoundments which become operative after the issuer receives the specified amount of proceeds from the sale of the securities. The act protects an investor who unknowingly relies on inaccurate information in choosing an investment, but does not protect an investor from an unwise or unfortunate management choice. To allow the administrator to impose conditions on impounded proceeds received from the sale of securities beyond the time at which the "specified amount" is accumulated would extend the administrator's authority beyond the regulation of the issuance, offer, sale, and purchase of securities into the regulation of post-sale management choices and would undermine the ability of investors to make private decisions regarding the terms of their investments in the wake of unforeseen investment risks. For these reasons, the conditions imposed on the escrow account in this case cannot be enforced by the administrator.

109 Mich App 96; 310 NW2d 907 (1981) reversed.

OPINION OF THE COURT

1. SECURITIES REGULATION — SALE OF SECURITIES — ESCROW DIS-
   BURSEMENTS.
   The Corporation and Securities Bureau does not have the author-
   ity to impose conditions concerning the disbursement of funds
   acquired from the sale of a registered security beyond the
   condition that funds be impounded until the issuer of the
   security receives a specified amount from the sale (MCL
   451.705[f][2], 451.812[a]; MSA 19.776[305][f][2], 19.776[412][a];
   1979 AC, R 451.705.3).

2. SECURITIES REGULATION — SALE OF SECURITIES.
   No security may be sold in Michigan unless it is registered as

required by the Uniform Securities Act; as a condition of registration by qualification, the administrator of the Corporation and Securities Bureau may require that the proceeds from the sale of the security be impounded until the issuer receives a specific amount from the sale and may determine the conditions of the impoundment so long as the conditions are intended to operate before the specified amount is collected (MCL 451.705[f][2]; MSA 19.776[305][f][2]).

CONCURRING OPINION BY WILLIAMS, C.J.

3. SECURITIES REGULATION — SALE OF SECURITIES.

   *The Uniform Securities Act protects an investor who unknowingly relies on inaccurate information in choosing an investment, but does not protect an investor from an unwise or unfortunate management choice; the administrator of the Corporation and Securities Bureau cannot impose conditions on impoundments which become operative after the issuer receives a specified amount of proceeds from the sale of the securities because to do so would extend the administrator's authority beyond the regulation of the issuance, offer, sale, and purchase of securities into the regulation of post-sale management choices and would undermine the ability of investors to make private decisions regarding the terms of their investments in the wake of unforeseen investment risks (MCL 451.705[f][2], 451.812[a]; MSA 19.776[305][f][2], 19.776[412][a]).*

*Ward, Schenk & Boncher* (by *Paul A. Ward* and *Gary P. Schenk)* for Burton Abstract & Title Company, St. Paul Title Insurance Corporation, and Westinghouse Electric Corporation.

*Steketee & Timmons* (by *Peter W. Steketee)* for Fred J. Schwaemmle Construction Company.

*Donovan, Hammond, Ziegelman, Roach & Sotiroff* (by *Dennis M. Rauss)* for Kelly Mortgage & Investment Company.

*Carruthers & Halverson Associates* (by *James G. Halverson)* for intervening defendants.

CAVANAGH, J. This appeal involves the disbursement of $125,000, plus interest, which remains in an escrow account. The issue of first impression

presented here is whether the Michigan Corporation and Securities Bureau has the authority to impose conditions concerning the disbursement of funds acquired from the sale of a registered security, beyond the condition that these proceeds be impounded until the issuer of the security receives a specified amount from the sale. We hold that the bureau has no such authority.

I

In 1972, Robert L. Foote decided to develop a 182-unit apartment complex in Kentwood, Michigan. Foote was the principal and owner of Springfield Corporation, a general contracting firm which was ultimately retained as the general contractor for the project. Foote attempted to develop the project with his own resources, but later decided to make a limited partnership offering to finance the completion. The underwriter of the offering was Financial Services Corporation of America (FSC). The limited partnership was named Foote Hills Associates. Foote was designated the general partner and FSC Properties the only special Class B limited partner. Six hundred sixty-seven Class A limited partnership interests were to be offered at $1,000 per unit.

This offering was properly registered by qualification pursuant to the Michigan Uniform Securities Act, MCL 451.501 et seq.; MSA 19.776(101) et seq. On April 16, 1973, the Corporation and Securities Bureau of the Michigan Department of Commerce authorized Foote Hills Associates and FSC (issuer) to make the offering, subject to several conditions. Condition 3 provided in pertinent part:

"The issuer shall deposit or cause selling broker-dealer to deposit and leave with the depositary until

further order of the Bureau in a special impoundmend
*[sic]* account 100 percent of the gross receipts accepted,
being 100 percent of the offering price, derived from the
offer of securities pursuant to this registration state-
ment, *subject to the rules of the Bureau and the terms
of an impoundment agreement satisfactory to the Bu-
reau between the issuer and the depositary.*".(Emphasis
added.)

The impoundment (escrow) agreement between
FSC (broker-dealer/underwriter) and Michigan Na-
tional Bank (escrow agent), dated April 12, 1973,
contained a schedule for the disbursement of the
impounded proceeds:

"5. The Escrow Agent shall retain and hold such
deposits as escrow agent for the conditional subscribers
named in Item 4 above, and the right and title to such
deposits shall rest with them alone, free and clear of
any counterclaim, debt, or lien until the said depart-
ment by its order, releases said deposits. Following such
release, the Escrow Agent shall thereafter release such
deposits to Underwriter upon the happening of the
following events:

"(i) Upon compliance by the Underwriter with the
condition in the order requiring this Escrow and upon
request of the Underwriters the sum of $417,000.00
shall be released to the Underwriter.

"(ii) Upon request of the Underwriter and delivery to
the Escrow Agent of the certificate of the Project Archi-
tect, Dimitrios Economedies, AIA, that the Project un-
dertaken by the Issuer is 75% complete, the sum of
$125,000 shall be released to the Underwriter.

"(iii) Upon request of the Underwriter made on the
date of the initial closing of the Permanent Loan, the
Escrow Agent shall release the remaining $125,000
then in Escrow together with all accrued interest, if
any;

\* \* \*

"(v) The term "Initial Closing of the Permanent
Loan" shall mean the closing at which the Permanent

Loan is initially funded in at least the 'floor' amount of $2,250,000. Initial Closing may take place either before or simultaneously with the Final Closing of the Permanent Loan."

A similar disbursement schedule was included in the offering circular and limited partnership agreement, which were given to the prospective limited partners.

All of the 667 limited partnership interests were sold to the intervening defendants. The first two disbursements were subsequently made pursuant to conditions 5(i) and (ii) and under the bureau's orders.

In the spring of 1974, it became apparent that Springfield Corporation would be unable to complete the project. FSC hired plaintiff Fred J. Schwaemmle Construction Company as a consultant. Extensive negotiations ultimately led to the complete withdrawal of Foote and Springfield Corporation from the project and the substitution of Schwaemmle as the general contractor. On May 30, 1974, a construction completion agreement was entered into by Foote Hills Associates, intervening plaintiff Kelly Mortgage and Investment Company (the construction mortgage lender), and Schwaemmle. The parties agreed that Schwaemmle would receive a $75,000 fee, over and above the costs of construction, for completing the project. Kelly Mortgage subsequently agreed to waive past defaults on the nearly $2 million construction loan, declined to commence foreclosure proceedings, and advanced another $150,000 to complete the project.

As part of its administrative duties as the special limited partner, FSC Properties sent a letter to the limited partners in May, 1974, advising them of these developments. Specifically, the part-

ners were told that Foote was unable to complete construction and that the funds from the original construction loan were insufficient. They were warned that it might be necessary to release the final $125,000 limited partners' capital toward completion of construction prior to the closing of a permanent loan. If this became necessary, the partners would have to approve this change in the disbursement schedule since it was included in the offering circular and limited partnership agreement. It was also noted that the permanent loan commitment had expired in March, 1974, and that permanent financing might not be obtained until the end of 1974 or early 1975. Nevertheless, the partners were assured that there was hope for the project on the basis of Schwaemmle's successful construction record and Kelly Mortgage's willingness to cooperate.

Schwaemmle subsequently completed construction in the fall of 1974. On September 12, 1974, FSC Properties notified the limited partners of this progress. After briefly referring to the May report, the letter stated that the partnership had to advance an additional $125,000 from the funds being held for Springfield Corporation pursuant to § 8.5 of the limited partnership agreement. Although Springfield had agreed to relinquish its claim to this money because it had not completed the project, at least 51% of the Class A limited partners had to approve the change. The limited partners were asked to complete an enclosed ballot concerning the amendment of § 8.5, which would purportedly allow the funds to be paid toward the actual costs of completing the project.

All of the limited partners agreed to this modification. However, the Corporation and Securities Bureau was never notified of this proposed amendment before the ballots were sent out. Plaintiffs

maintain that after the ballots were returned, they petitioned the bureau in November, 1974, for the disbursement of the final $125,000 from the escrow account. That petition apparently was never acted upon.

Even though construction was completed and the apartment units were leased, permanent financing could not be obtained. In addition, some of the subcontractors, laborers, and materialmen had not been paid.[1] Kelly Mortgage foreclosed on its construction mortgage and purchased the complex in May, 1976, for approximately $3.5 million. In September, 1977, Kelly Mortgage sold the property for $2.75 million.

In late 1977, Schwaemmle petitioned the bureau for the release of the $125,000. It asserted that it had never been paid its $75,000 fee and that it had performed all of its contractual obligations. The bureau issued a preliminary order on November 22, 1977, directing that the remaining escrowed funds be returned on a pro-rata basis to the individual limited partners because a permanent loan commitment had never been obtained.

An administrative hearing was subsequently conducted. The hearing officer informed the parties at the outset that the only issues that would be determined were whether the terms of the escrow agreement had been met or waived and, if not, whether the limited partnership or the individual limited partners should receive the escrowed funds. The officer believed that he did not have the power to evaluate the parties' other equitable and legal claims to the fund. However,

[1] Intervening plaintiffs Burton Abstract and Title Company and St. Paul Title Insurance Company paid these debts and therefore claim an interest in the escrowed funds as assignees and subrogees. Plaintiff Westinghouse supplied the appliances used to complete the project, but apparently was reimbursed by Burton Abstract.

he did allow the parties to make a limited record for appellate purposes.

In an order dated January 25, 1978, the hearing officer upheld the preliminary order returning the funds to the limited partners. He reasoned that § 305 of the securities act permits the Corporation and Securities Bureau Administrator to impound the proceeds from the sale of a security and to determine the conditions of any such impoundment. Administrative Rule 705.3 further provides that these funds can be released only by a written petition affirming compliance with the registration. The escrow could only be broken with the consent of the bureau. It was undisputed that the terms of the escrow agreement were not met since permanent financing was not and could not be obtained. The only basis for not returning the funds to the partners would be if they had properly waived their right to the funds.

The officer concluded that the purported waiver was ineffective for three reasons. First, the funds could only be released by order of the Commerce Department. No one ever requested approval of the waiver or consulted the bureau to determine the appropriate method of doing so. The officer believed that plaintiffs were attempting to change "the ground rules of the game," which would consequently change the risks for the limited partners.

Second, the bureau was required, in conjunction with the sale of securities, to ensure that an offering is fair and provides full disclosure so that an investor can make an informed decision. The securities act provides various protections, including the escrow provision. In addition, § 410(g) makes void any waiver by an investor of the protections afforded by the act or the rules and orders of the bureau.

Finally, disclosure was grossly inadequate for an effective waiver. The officer based this conclusion on an examination of the agreements, letters, and ballot, as well as the testimony of three limited partners. These witnesses testified that they were unaware of the escrow account and believed that they were merely authorizing payment to Schwaemmle as the new general contractor. They did not intend to waive the conditions of the escrow agreement or their right to the funds.

The Ingham Circuit Court reversed the bureau's decision on the ground that there was substantial, competent, and material evidence to support plaintiffs' claims that the waivers were valid. The funds were awarded to plaintiffs and intervening plaintiffs.

The Court of Appeals reversed the judgment of the circuit court and reinstated the bureau's decision. 109 Mich App 96; 310 NW2d 907 (1981). It concluded that the circuit court did not use the proper standard of review, but conducted a proceeding *de novo.* The Court stated that § 305(f)(2) authorized the bureau to impose, either by rule or order, conditions concerning the escrow agreement beyond those relating to the minimum amount required for release. Rule 705.3 similarly authorized the administrator to impose other conditions on the release of escrowed funds. The administrator's April 16, 1973, order incorporated the conditions contained in the escrow agreement. The parties conceded that condition 5(iii) of that agreement had never been met.

As to the purported waiver, the Court of Appeals noted that paragraph 5 of the bureau's order stated that the terms of the order and registration statement could not be altered without prior bureau approval. No such approval was requested or received. Furthermore, § 410(g) prevented the

amendment. Even if the limited partners could have waived the escrow condition without prior bureau approval, the September, 1974, letter requested an amendment as to the *party* entitled to the money *once* the escrow condition had been met. The letter and ballot did not refer to the escrow agreement, and there was no evidence that the limited partners actually knew that the amendment was designed to alter the escrow agreement.

This Court granted plaintiffs' and intervening plaintiffs' delayed application for leave to appeal. 417 Mich 1041 (1983).

II

Plaintiffs and intervening plaintiffs initially argue that the Corporation and Securities Bureau cannot condition the release of impounded proceeds on anything other than the success of the initial offering. The bureau allegedly exceeded its statutory authority when it conditioned the release of two installments upon the 75% completion of the project and the acquisition of permanent financing.

This dispute is governed by the Michigan Uniform Securities Act. The act was designed to protect the public from fraud and deception in the issuance, sale, exchange, or disposition of securities within this state by requiring the registration of certain securities and transactions. *People v Dempster,* 396 Mich 700, 704; 242 NW2d 381 (1976). Its purpose "is to prevent stockholders and promoters from perpetrating frauds and impositions on unsuspecting investors in hazardous undertakings and to protect credulous and incompetent persons from their own inclinations to speculate in hazardous enterprises." *People v Brecken-*

*ridge,* 81 Mich App 6, 14-15; 263 NW2d 922 (1978), *lv den* 402 Mich 915 (1978). The act should be broadly construed to effectuate these purposes. *Dempster, supra.*

Under § 305(f)(2), the administrator of the Corporation and Securities Bureau may require, as a condition of registration by qualification, that the proceeds from the sale of a security be impounded:

"The administrator may by rule or order require as a condition of registration by qualification or coordination:

* * *

"(2) That the proceeds from the sale of the registered security in this state be impounded *until the issuer receives a specified amount from the sale of the security* either in this state or elsewhere. *The administrator may by rule or order determine the conditions of any* * * * *impounding required hereunder.''* MCL 451.705(f)(2); MSA 19.776(305)(f)(2). (Emphasis added.)

The purpose of this provision is to ensure that the issuer has sold a significant portion of the securities offered and has raised sufficient financial resources before the project is commenced and the proceeds of the sale expended.

However, § 305(f)(2) only authorizes the administrator to impound proceeds *until* the issuer receives a specified amount. The administrator may impose additional conditions on such impoundments, but he cannot attach conditions which are intended to become operative after the issuer receives the specified amount of proceeds. Stated another way, the bureau cannot require continued impoundment after the issuer has satisfactorily shown that he has deposited the requisite amount of proceeds in escrow and otherwise complied with the securities act.

Section 412(a) of the act authorizes the adminis-

trator to make such rules and orders as are necessary to carry out the provisions of the act. MCL 451.812(a); MSA 19.776(412)(a). Pursuant to this rule-making authority, rule 705.3 was promulgated:

"(1) As a condition to registration by qualification or coordination, the administrator may require that the proceeds from the sale of the registered security in this state be impounded *until the issuer receives a specified amount from the sale of the security* in this state or elsewhere, sufficient to accomplish the purposes of the offering, *or until certain stipulated requirements are met.*

"(2) In a new promotional enterprise, the administrator will ordinarily require that 100% of the sales price be impounded and that the 100% be returned to investors entitled thereto upon order of the administrator *in case of failure to raise the specified amount* within 1 year or during the effectiveness of the registration, *or if certain stipulated requirements are not met.* In such case, the promoters will be required, by equity investment or otherwise in a manner satisfactory to the administrator, to defray the discount, commission and expenses of the public offering including the expense of the impoundment and possible refunds. Consideration will be given to reduction of this percentage to defray some or all of the public offering costs in any instance of an enterprise with reduced promotional remuneration and advantages. No funds may be released except upon order of the administrator and all funds may be subject to audit before release.

\* \* \*

"(4) A request for the release of impounded funds when requirements are met shall be by petition in writing affirming compliance with the registration and shall be accompanied by a statement from the depositary setting forth the total amount on deposit." 1979 AC, R 451.705.3. (Emphasis added.)

This rule differs significantly from § 305(f)(2).

Under subsection (1) of rule 705.3, impoundment may be imposed and continued until certain stipulated conditions are met, even if the specified amount of proceeds have been properly deposited in escrow. Furthermore, under subsection (2), the administrator may require the issuer to return the sales price to the investors of a new promotional enterprise for failure to meet the stipulated conditions, even if 100% of the sales price has been impounded. When either of these situations occur, the power granted to the administrator by rule 705.3 clearly exceeds the power granted by § 305(f)(2) of the securities act.

The administrator may include stipulated requirements as conditions of the impoundment as long as they are intended to operate before the specified amount is collected. However, the stipulations cannot authorize continued impoundment or return of the proceeds once the issuer sufficiently demonstrates that he has deposited the requisite amount and otherwise complied with the securities act.[2]

The intervening defendants claim that the April 16, 1973, order incorporated by reference the disbursement schedule contained in the escrow agreement. Assuming *arguendo* that this is true,[3] the

---

[2] To ensure that the issuer has sufficiently complied with the bureau's order and the securities act, the bureau properly requires under rule 705.3 that the request for release be in writing and accompanied by a statement from the depositary setting forth the total amount on deposit. The requirement that the bureau issue a release order also serves this purpose.

Nothing in this opinion is intended to limit the Corporation and Securities Bureau from subsequently issuing a stop order denying effectiveness to, or suspending or revoking the effectiveness of, any registration statement under § 306 of the securities act. MCL 451.706; MSA 19.776(306).

[3] It is debatable whether the disbursement schedule was incorporated in the order. Paragraph 5 of the escrow agreement stated that the escrow agent was required to hold the deposits until the Commerce Department ordered their release. *Following that release,* the

Corporation and Securities Bureau did not have the power to include or enforce any of the conditions precedent to the release of the installments.[4] The bureau properly included such conditions as the percentage of proceeds that had to be impounded and how the proceeds could be invested by the escrow agent during impoundment. These are typical examples of conditions which may be imposed under § 305(f)(2).

## III

Although the bureau had no authority to include the disbursement schedule in its order or enforce it, final disbursement under Section 5(iii) of the original escrow agreement still could not have occurred until the initial closing of the permanent loan. In anticipation of the possibility that permanent financing could not be obtained, waivers of this disbursement condition were sought and obtained from intervening defendants. The validity of these purported waivers therefore remains. Intervening defendants present essentially three arguments: (1) the waiver was ineffective because material and relevant facts were insufficiently disclosed or concealed; (2) condition 5 of the April 16, 1973, order required prior bureau approval for

agent thereafter was to disburse the funds upon request of the underwriter (FSC) when certain events occurred. None of these events required that the bureau issue an order to the escrow agent to release the funds. Condition 5(i) merely stated that once the underwriter complied with the bureau's impoundment order (i.e., deposited all the proceeds in escrow), the first installment would be released. We decline to decide this point, however, since it is unnecessary to the resolution of this case.

[4] Although condition 5(i) merely stated that the first installment would be released once the impoundment order was complied with, only a $417,000 disbursement was permitted. Under this decision, the bureau must release all of the proceeds once the issuer sufficiently demonstrates that he has deposited the specified amount in escrow and otherwise complied with the securities act.

any amendment; and (3) § 410(g) of the securities act voids any purported waiver by an investor of any provision of the act or any bureau rule or order.

We decline to decide whether disclosure was inadequate for two reasons. First, the bureau did not have jurisdiction to decide this fact question. The Uniform Securities Act, which the bureau is required to administer, is

> "AN ACT to enact the uniform securities act *relating to the issuance, offer, sale or purchase of securities* and commodity contracts; *to prohibit fraudulent practices in relation thereto;* to establish civil and criminal penalties for violations of the act and civil penalties for violation of the rules promulgated pursuant to the act; *to require the registration of* broker-dealers and their principals, agents, investment advisers, commodity issuers, and *securities;* to make uniform the law with reference thereto; and to repeal certain acts and parts of acts." (Emphasis added.)

The attempted amendment of the disbursement schedule subsequent to the sale of the limited partnership interests was totally unrelated to the issuance, offer, sale, or purchase of these interests. Intervening defendants have never alleged fraud in the issuance, offer, sale, or purchase of the securities, and it is undisputed that they were properly registered and sold.[5] The bureau, by deciding the waiver issue, has in effect treated this case as a continuing sale and purchase. The Legislature never intended that the bureau be involved, under the guise of the securities act, in the internal affairs of a corporation or partnership once the

---

[5] Thus, this is not an action to recover the purchase price of the securities under § 410. MCL 451.810; MSA 19.776(410). Note that none of the impoundment conditions purportedly imposed pursuant to § 305(f)(2) were violated since the escrow agent never released the funds.

sale of securities has been successfully and properly completed. Blue sky laws are not intended to protect investors from financial loss in general, but from fraud which may lead to such financial loss. 69 Am Jur 2d, Securities Regulation—State, § 1, p 1060. See also *Merrick v N W Halsey & Co,* 242 US 568, 587-588; 37 S Ct 227; 61 L Ed 498 (1917).

Second, the parties were prevented from litigating all of their equitable and legal arguments concerning the validity of the waiver. The hearing officer correctly ruled that creditor claims were outside the scope of this case and beyond his jurisdiction to decide.[6] He limited his decision to whether the waiver was valid under the securities act and the related regulations. This prevented the parties from raising the estoppel arguments and statutory defenses which they subsequently asserted on appeal.[7] These arguments could not have been properly decided by the Ingham Circuit Court since its jurisdiction was limited to an appellate review of the bureau's decision. MCL 451.811; MSA 19.776(411). In fact, the circuit court specifically denied intervening defendants' motion to offer additional evidence on these claims. Since these claims may be dispositive, the record is inadequate, and no lower court has ruled on the merits, we cannot decide them.

---

[6] Many of the parties to this appeal are litigants in several other contract and lien foreclosure actions which have been filed in state and federal courts. Apparently, these proceedings have been stayed pending resolution of this appeal. The sole purpose of this case is to determine who is entitled to the impounded funds under the escrow agreement, limited partnership agreement, and the purported amendment thereof.

[7] Schwaemmle argued that even if the waivers were not valid, it was still entitled to the escrowed funds on the grounds of promissory and equitable estoppel. Specifically, Schwaemmle maintained that it agreed to complete construction only because FSC and Kelly Mortgage assured that its $75,000 fee would come from the escrowed funds. The limited partners countered that Schwaemmle's claim was barred because it did not have a builder's license, as required by MCL 338.1516; MSA 18.86(116) (now MCL 339.2412; MSA 18.425[2412]):

We briefly address the remaining issues since they do not involve questions of fact, they were fully litigated below, and they may reoccur during future proceedings.

Condition 5 of the bureau's order provides:

"None of the securities shall be offered and sold except in accordance with the terms of this order and the registration statement without first securing amendment of the order or the written permission of the Bureau. Before executing any agreements or before finalizing and putting into effect any proposed changes, requirements of the Bureau shall be ascertained and compliance effected therewith."

This condition only requires bureau approval of changes which will be made while the securities are being offered and sold.

Section 410(g) of the act provides:

"Any condition, stipulation, or provision binding any person acquiring any security or commodity contract to waive compliance with any provision of this act or any rule or order hereunder is void." MCL 451.810(g); MSA 19.776(410)(g).

The attempted amendment of § 8.5 of the partnership agreement did not violate this section. The amendment did not purport to waive compliance with any statutory, regulatory or order provision. Since the disbursement schedule of the escrow agreement should not have been incorporated in the bureau's order, the amendment could not have conflicted with the bureau's rules or order.

### IV

The decision of the Court of Appeals is reversed and the case remanded to the Corporation and Securities Bureau for dismissal of plaintiffs' peti-

tion. The parties may institute further proceedings in the appropriate forum concerning those issues not resolved by this decision. We do not retain jurisdiction.

KAVANAGH, LEVIN, RYAN, BRICKLEY, and BOYLE, JJ., concurred with CAVANAGH, J.

WILLIAMS, C.J. I concur generally in the result and rationale of the majority opinion and specifically in the decision reached in section II, but write separately to lend further support to the conclusion that the administrator cannot impose conditions on impoundments which become operative after the issuer receives the "specified amount" of proceeds.

As noted by the majority, the purpose of the particular provision at issue here, MCL 451.705(f)(2); MSA 19.776(305)(f)(2), is to ensure that the issuer has raised sufficient funds for a viable venture before the project is commenced and investors' monies are expended. In addition, the general purpose of the act is to protect investors from fraudulent practices in the security "issuance, offer, sale or purchase" phase. Preamble to 1964 PA 265, MCL 451.501 *et seq.;* MSA 19.776(101) *et seq.* The act protects an investor who unknowingly relies on inaccurate information in choosing an investment, but does not protect an investor from an unwise or unfortunate management choice. To allow the administrator to impose conditions on impounded proceeds received from the sale of securities beyond the time at which the "specified amount" is accumulated would extend the administrator's authority beyond the regulation of the issuance, offer, sale, and purchase of securities into the regulation of post-sale management choices. This would undermine the ability of

investors such as the intervening defendants here
to make private decisions regarding the terms of
their investments in the wake of unforeseen in-
vestment risks. For these reasons, the conditions
imposed on the escrow account here cannot be
enforced by the administrator.