SCOTT et al. v. FRAZIER et al.

(District Court, D. North Dakota, S. E. D. June 14, 1919.)

1. CONSTITUTIONAL LAW ⬪210, 252—FOURTEENTH AMENDMENT—"PERSON"—STATE.

The Fourteenth Amendment to the federal Constitution, protecting any "person" in certain rights, is inapplicable to a state.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Person.]

2. COURTS ⬪328(3)—JURISDICTION OF FEDERAL COURT—AMOUNT IN CONTROVERSY—TAXPAYER'S SUIT.

In suit by taxpayers, in behalf of themselves and other taxpayers, to enjoin state officers from paying out public funds and from issuing bonds of the state, the entire fund represented is not the amount in controversy.

3. COURTS ⬪328(4)—JURISDICTION OF FEDERAL COURT—AMOUNT IN CONTROVERSY—TAXPAYER'S SUIT.

In suit by taxpayers to enjoin state officers from paying out public funds and from issuing bonds of the state the individual taxpayers though suing on behalf of all taxpayers must each have an interest exceeding $3,000 to give federal court jurisdiction.

4. TAXATION ⬪25—LEGISLATIVE POWER.

The power of taxation is legislative.

5. CONSTITUTIONAL LAW ⬪48—PRESUMPTIONS—TAX LAWS.

The presumption that a law is constitutional applies with unusual force to laws enacted under the taxing power.

6. CONSTITUTIONAL LAW ⬪48—PRESUMPTIONS—PURPOSE OF TAXING STATUTE.

The presumption that a taxing law is constitutional applies with peculiar force to a legislative declaration that the tax is levied for a public purpose.

7. CONSTITUTIONAL LAW ⬪81—POLICE POWER—GENERAL WELFARE.

The police power includes laws intended to promote public prosperity and general welfare.

8. CONSTITUTIONAL LAW ⬪70(3)—WISDOM OF STATUTE—DEFECT.

In determining the constitutionality of a statute, the courts are not concerned with the legislative policy or the statute's wisdom or folly, since these considerations belong exclusively to the Legislature.

---

⬪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. CONSTITUTIONAL LAW ☞283—FOURTEENTH AMENDMENT—NORTH DAKOTA STATUTE.

North Dakota constitutional amendments and statutes authorizing payment of public funds and bond issues, to enable the state to engage in various business enterprises, *held* not to deprive taxpayers of their property without due process of law, in violation of Fourteenth Amendment to the federal Constitution, and a bill so alleging does not state a case arising under the federal Constitution, so as to confer jurisdiction on a federal District Court.

10. CONSTITUTIONAL LAW ☞48—STATE STATUTES—DOUBT.

State constitutional amendments alleged to violate the Fourteenth Amendment to the federal Constitution will be sustained, if the court is in doubt regarding their validity, for it is only where legislation is palpably unconstitutional that a court is justified in nullifying it.

In Equity. Suit by John W. Scott and others, on behalf of themselves and all other taxpayers of the state of North Dakota, against Lynn J. Frazier, William Langer, and John N. Hagen, acting and pretending to act as the Industrial Commission of North Dakota, and others. Bill dismissed.

N. C. Young, J. S. Watson, and E. T. Conmy, all of Fargo, N. D., and Tracy R. Bangs, Phillip R. Bangs, C. J. Murphy, and T. A. Toner, all of Grand Forks, N. D., for plaintiffs.

Wm. Lemke, of Fargo, N. D., and Frederick A. Pike, of St. Paul, Minn., for Industrial Commission of North Dakota.

William Langer, Atty. Gen., D. L. Nuchols, of Mandan, N. D., and W. S. Lauder, of Wahpeton, N. D., for other defendants.

AMIDON, District Judge. This is a suit in equity to restrain the defendants (a) from paying out public funds in the state treasury amounting to several hundred thousand dollars; (b) from issuing bonds of the state for a much larger amount; and (c) to have two amendments of the state Constitution and the statutes authorizing the above payments and bonds declared null and void. It is charged in the bill that the payments are to be made, and the bonds issued, for private, as distinguished from public, purposes; that they will result in creating debts which can only be paid by taxes upon the property of the citizens of the state.

The plaintiffs are 42 taxpayers, and bring this suit on behalf of themselves and all other taxpayers. They are all citizens and residents of the state of North Dakota. This is also true of the defendants, so jurisdiction cannot be rested on diversity of citizenship.

The jurisdiction of this court is based upon two facts: First, that the amount in controversy exceeds the sum or value of $3,000; and, second, that the suit arises under the Fourteenth Amendment of the federal Constitution. A case showing both these features must be made out by the bill; otherwise, the court is without jurisdiction, and the motion of defendants to dismiss should be granted.

Plaintiffs rest their claim of the first element of jurisdiction, namely, that the amount in controversy exceeds the sum or value of $3,000, upon two grounds:

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] 1. They assert that the suit is brought on behalf of the state to protect it against the unconstitutional use of its funds, and an unconstitutional issue of bonds. That being the nature of the suit, it is claimed that the entire fund is the amount in controversy, and not the right or possible damage of the plaintiffs. This theory presupposes that the state has rights that are protected by the Fourteenth Amendment. If it has no such rights, plaintiffs have no standing in this court as its representatives and must stand on their own feet. Has the state, then, any rights under the Fourteenth Amendment? That question must be answered in the negative. The amendment protects only the rights of "persons." This term has been enlarged by judicial interpretation so as to cover private corporations. It does not embrace public corporations, much less the state. Its language is:

"Nor shall any state deprive *any person* of life, liberty, or property, without due process of law, nor deny to *any person* within its jurisdiction the equal protection of the laws."

It would be a perversion of language to say this language protects the state against acts of the state. It protects persons only, a term which embraces private corporations, but not public corporations or states. It follows, therefore, that plaintiffs, while they assert rights under the Fourteenth Amendment, cannot assert rights of the state because it has no rights that are protected by that amendment. It necessarily results that plaintiffs in this suit represent only themselves.

[2] 2. Plaintiffs assert that in suits to restrain an unconstitutional use of public funds, or issue of bonds, or levy of tax, the amount of the funds or of the bonds or of the tax is the measure of the "amount" in controversy and not the injury to plaintiffs. There is some language in the cases which supports that view. It is, however, at variance with the decision of the Supreme Court in Colvin v. Jacksonville, 158 U. S. 456, 15 Sup. Ct. 866, 39 L. Ed. 1053, and with the uniform practice in federal courts since that decision has become known to the profession. That was a taxpayers' suit. It was brought to restrain a threatened issue of bonds for $1,000,000. It was proven that the amount of taxes which would be levied on plaintiff's property in case the bonds were issued would be less than $2,000, the amount then necessary to confer jurisdiction, and the trial court dismissed the bill for want of jurisdiction. Plaintiff insisted that the amount of the bond issue, and not his tax liability, was "the amount in controversy," and at his instance the court certified the question of jurisdiction to the Supreme Court. Any one who will read the certificate as set forth at page 458 of 158 U. S., 15 Sup. Ct. 866 (39 L. Ed. 1053), in the report, will see that the exact question involved under this heading of the present case was there presented to the Supreme Court. In deciding it, the court says, at page 460 of 158 U. S., at page 867 of 15 Sup. Ct. (39 L. Ed. 1053):

"This leaves the only question to be considered whether the amount of the interest of complainant, and not the entire issue of bonds, was the amount in controversy, and, in respect of that, we have no doubt the ruling of the Circuit Court was correct."

The court then examines Brown v. Trousdale, 138 U. S. 389, 11 Sup. Ct. 308, 34 L. Ed. 987, which was cited to me by counsel for the plaintiffs, and then orders decree affirming the decision of the lower court. It is plain, therefore, that the court there regarded Brown v. Trousdale as in harmony with the decision which it was rendering, or that its language ought to be qualified so as to bring it into harmony.

The case of Colvin v. Jacksonville, supra, is not referred to by the Circuit Court of Appeals of this circuit in its opinion in City of Ottumwa v. City Water Supply Co., 119 Fed. 315, 56 C. C. A. 219, 59 L. R. A. 604. Plaintiff's interest in the Ottumwa Case was sufficient to confer jurisdiction, so the language in the second paragraph of the opinion on page 318 of 119 Fed., 56 C. C. A. 219 (59 L. R. A. 604), was obiter, and, as it is in direct conflict with the decision in the Colvin Case, must be treated as an erroneous statement of the law.

Colvin v. Jacksonville has never been qualified or criticized by the Supreme Court or any Circuit Court of Appeals. From the date of that decision to the present time it has been the uniform practice in taxpayers' suits to restrain an issue of bonds, or a levy of taxes, to show that plaintiffs' threatened damage was sufficient to confer jurisdiction. The latest decision on the subject is Greene v. Louisville & Interurban Railroad Co., 244 U. S. 499–508, 37 Sup. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88. See, also, Orleans-Kenner Electric Ry. Co. v. Dunbar, 218 Fed. 344, 134 C. C. A. 152, Cowell v. City Water Supply Co., 121 Fed. 53, 57 C. C. A. 393, and Risley v. Utica, (C. C.) 168 Fed. 737.

In suits to enjoin a threatened tax levy, and that is the nature of the suit here, in all its aspects, the authorities are uniform that the individual plaintiffs must each have an interest in the amount of $3,000, and that several plaintiffs cannot aggregate their interests for the purpose of making up the $3,000. Wheless v. City of St. Louis (C. C.) 96 Fed. 865; same case, 180 U. S. 379, 21 Sup. Ct. 402, 45 L. Ed. 583; Rogers v. Hennepin Co., 239 U. S. 621, 36 Sup. Ct. 217, 60 L. Ed. 469.

How, then, are the numerous cases referred to in Dillon on Municipal Corporations (5th Ed.) section 1579 et seq., and cited to the court in argument, to be explained? That is not difficult. None of them asserts rights under the Fourteenth Amendment. They all involve cases in which cities were attempting to levy taxes or issue bonds in violation of state laws or state Constitutions. With the exceptions presently to be mentioned, the cases all arose in state courts. There it is not necessary for a plaintiff to show any particular amount as the basis of jurisdiction. Taxpayers may sue in the state courts, and claim the protection of the Fourteenth Amendment, without showing that they have a personal interest amounting to $3,000. The only object of the averment that they are taxpayers is simply to show that they are not intermeddlers. If the state courts deny relief to taxpayers, thus asserting rights under the Fourteenth Amendment, a writ of error to the Supreme Court of the United States will lie to review the decision. This distinction must be kept constantly in mind in exam-

ing decisions of the Supreme Court: Was the case brought before that court by writ of error from the highest court of the state, or by writ of error or appeal to review the decisions of a federal Circuit or District Court? In one case the amount involved is immaterial, and in the other it is controlling.

It remains to notice two cases which are relied on by plaintiffs. The first is Crampton v. Zabriskie, 101 U. S. 601, 25 L. Ed. 1070. That involved an issue of bonds by the county of Hudson in the state of New Jersey for several hundred thousand dollars. The bonds were illegal because no provision for their payment by tax levy was made as the law required. On certiorari to the board issuing the bonds, a judgment was entered by the Supreme Court of the state, declaring them void. Notwithstanding this judgment, the bonds were issued to the plaintiff, Crampton. He then brought an action at law to collect the bonds in the federal court. Jurisdiction of this action was based upon diversity of citizenship and the complaint showed the requisite jurisdictional averment. Zabriskie and two other resident taxpayers of the county thereupon filed a bill of complaint on the equity side of the federal court, praying that the bonds be declared void and be delivered up, and that the board be ordered to reconvey the property to Crampton, and that he be enjoined from prosecuting the action at law or parting with the bonds in any other way than by surrendering them to the board. This bill was, of course, ancillary, and jurisdiction of the federal court to entertain it rested upon its jurisdiction over the action brought by Crampton. Such being the nature of the suit, two facts are clear: First, that the taxpayers' rights were based on a violation of state law, and not on the Fourteenth Amendment; second, that jurisdiction of the court was based on the original action brought by Crampton, and the complaint in that clearly showed a right in the plaintiff sufficient to confer jurisdiction. What the court says in the passage quoted by counsel about the right of taxpayers to maintain a suit in equity to prevent an illegal disposition of the moneys of the county, or the illegal creation of a debt, is addressed to the question whether taxpayers have a right to maintain such a suit to protect their own interests, and has nothing to do with the question for which the quotation was cited in argument here, namely, the right of taxpayers to assert rights of the state, or of a city. Mr. Justice Field in the language used, is answering the contention that a taxpayer under no circumstances can maintain such a suit. Such is the holding of the courts of New York and several other state courts. Dillon on Municipal Corporations (5th Ed.) section 1585.

The other case cited by plaintiffs here is Davenport v. Buffington, 97 Fed. 234, 38 C. C. A. 453, 46 L. R. A. 377. That came before the Circuit Court of Appeals of this circuit on appeal from the Supreme Court of Indian Territory. It involved, therefore, no question of jurisdiction of the trial court, as a federal court, depending upon a showing that the plaintiff had a right of the value of $3,000. The suit was brought by taxpayers to prevent the use of property which had been given to a city for a park for other purposes. The taxpayers filed their bill to enforce this trust. No right is asserted under the

Fourteenth Amendment. The passage quoted simply goes to the general question of the right of taxpayers to maintain suits in equity to prevent a misuse of property or funds belonging to a city.

It may be doubted whether taxpayers may maintain a suit against state officers to vindicate alleged rights of a state. I have been unable to find any authority that would support such a doctrine. Such suits have been confined to actions against municipal officers to vindicate the rights of cities. Such are all the cases cited by Judge Dillon in his work on Municipal Corporations, section 1579. The reasons which permit such suits in the case of municipal corporations have no application to states. Municipal corporations exist under special charters and have only such powers of taxation as are specifically conferred upon them. They have many of the qualities of a private corporation, and the right to maintain taxpayers' suits has been rested upon the same ground as the right of stockholders to maintain similar suits in behalf of a private corporation. States are not municipal corporations. Their powers are not defined by charter. They possess all powers except as they are limited by the state and federal Constitutions. This is especially true of their power to tax. The power to maintain taxpayers' suits even against municipal officers has been denied by the courts of New York, Massachusetts, and several other states. Dillon, § 1585 et seq. I can find no justification for extending the doctrines to actions against state officers.

From this examination, the conclusion necessarily follows that plaintiffs must show a personal interest amounting to $3,000 in order to give this court jurisdiction, and as no such showing is made in the present bill, the jurisdiction of the court as a federal court fails.

The other jurisdictional element presents the question whether the bill shows a case arising under the Fourteenth Amendment. That depends on whether the purpose for which the laws here assailed seek to use the taxing power is private or public. When a state enters a new field of taxation, as North Dakota has in these laws, that question is always raised. It was urged against laws to establish public schools, and publicly owned water, gas and electric plants, with the same vehemence as it is now urged against the present laws. The line of legislative power has been steadily advanced as society has come to believe increasingly that its welfare can best be promoted by public as distinguished from private ownership of certain business enterprises. Laws which at one time were held invalid, have at a later period been sustained by the same court. No judge can investigate judicial decisions rendered during the past 10 years without being impressed with the rapid extension of state activity into fields that were formerly private. The twilight zone that separates here permissible from forbidden state action is broad. Business which will seem to one court to be public will seem to another to be private. The decisions on the subject are cited and analyzed by the Supreme Court of Louisiana in the recent case of Union Ice & Coal Co. v. Huston, 135 La. 898, 66 South. 262, L. R. A. 1915B, 859, Ann. Cas. 1916C, 1274. See, also, 27 Yale Law Journal, 824–835, for a scholarly examination of the subject.

McQuillin on Municipal Corporations, section 1809, and the fifth edition of Dillon on Municipal Corporations, volume 3, section 1292, which contain the last word of text-writers on the subject, solemnly inform us that cities cannot be authorized to establish publicly owned coal and wood yards, because that would be using the taxing power for a private purpose. The next edition of these works will strike out this language and inform us that such yards are permissible, because they are for a public purpose and are publicly owned, citing Jones v. Portland, 245 U. S. 217, 38 Sup. Ct. 112, 62 L. Ed. 252, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660. Thus "can" succeeds "can't" in this field of law so rapidly that one can hardly tell which word he is looking at.

What may be done by the state to protect its people and promote their welfare cannot be declared by a priori reasoning. New evils arise as the result of changing conditions. If the state remains static, while the evils that afflict society are changing and dynamic, the state soon becomes wholly inadequate to protect the public. The state must be as free to change its remedies as the evils that cause human suffering are to change their forms. Merrick v. Halsey Co., 242 U. S. 568–588, 37 Sup. Ct. 227, 61 L. Ed. 498.

There are a few great landmarks by which to determine whether laws authorizing taxation are for a public or a private purpose. We shall find our way best by first looking at them.

[3, 4] 1. The power of taxation is legislative. The right of the people to determine the amount and purpose for which taxes may be levied has for centuries, in this country and in England been regarded as the peculiar prerogative of the representatives of the people in their legislative bodies. As Marshall said in McCulloch v. Maryland, 4 Wheat. 316, 428 (4 L. Ed. 579):

"The only security against the abuse of the power is found in the structure of the government itself. In imposing a tax the Legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a state, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of the government cannot be limited they prescribe no limits to the exercise of this right, resting confidently on the interests of the Legislature, and on the influence of the constituents over their representatives, to guard them against its abuse."

This language has been qualified by later decisions of the Supreme Court holding that a tax must be for a public purpose or it is a deprivation of property without due process of law, and that the final decision of whether a tax is for a public purpose is for the courts, and not the Legislature. It is nevertheless true that the presumption that a law is constitutional is applied with unusual force in favor of laws passed in the exercise of the power of taxation. The power of taxation lies in a field of even broader legislative discretion than the "police power" under which constitutional questions have been most frequently raised.

[5, 6] 2. This presumption in favor of laws imposing taxes is, as Judge Cooley says, in his work on Taxation (3d Edition, page 185) "applicable with peculiar force to the case of a legislative decision

upon the *purpose* for which a tax may be laid. For in the first place there is no such thing as drawing a clear and definite line of distinction between purposes of a public and·those of a private nature. Public and private interests are so commingled in many cases that it is difficult ΄to determine which predominates; and the question whether the public interest is so distinct and clear as to justify taxation is found embarrassing to the Legislature, and no less so to the judiciary. * * * To justify the court in declaring the tax void, the absence of all possible public interest in the purpose for which the funds are raised must be clear and palpable—so clear and palpable as to be perceivable by every mind at first blush."

3. "Limitations or restrictions upon the exercise of this essential power of sovereignty can never be raised *by implication,* but the intention to·impose them must be expressed in clear and unambiguous language." Cooley on Taxation, page 177. What constitutes a public purpose will vary in different communities and different periods. Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 117 Sup. Ct. 56, 41 L. Ed. 369; Clark v. Nash, 198 U. S. 362, 25 Sup. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171; O'Neill v. Leamer, 239 U. S. 244, 253, 36 Sup. Ct. 54, 60 L. Ed. 249; Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487.

4. The Fourteenth Amendment contains no express language limiting the taxing power of states. Laws have been condemned by holding that a tax for a purely private purpose deprives the taxpayer of his property without due process of law. When is a tax for a "purely private purpose" within this rule?

(a) The only cases in the federal courts in which laws have been condemned are those in which bonds or public funds were given as a mere gratuity to a *privately owned manufacturing enterprise* to encourage its establishment within the city. Such are the cases cited by counsel for plaintiff. Loan Association v. Topeka, 20 Wall. 655, 22 L. Ed. 455; City of Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. 442, 27 L. Ed. 238; Cole v. City of La Grange, 113 U. S. 1, 5 Sup. Ct. 416, 28 L. Ed. 896; Dodge v. Mission Township, 107 Fed. 827, 46 C. C. A. 661, 54 L. R. A. 242.

(b) I have not been able to discover any instance in which the Supreme Court has held invalid an exercise of the taxing power of the state for establishing and maintaining an industry *which was owned by the state or a municipality.* Such is the character of all the laws here assailed. The industries are to be owned by the state or cities. The latest expression of the Supreme Court on the subject is Jones v. City of Portland, 245 U. S. 217, 38 Sup. Ct. 112, 62 L. Ed. 252, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660, sustaining a statute of the state of Maine authorizing cities to establish and maintain wood, coal, and fuel yards for the purpose of selling at cost wood, coal, and fuel to their inhabitants. This decision is the more impressive because a similar law had been held invalid by the Supreme Court of Massachusetts and by some other state courts.

(c) The leading authority in this country declaring a statute un-

constitutional because it authorized taxation for private purposes is Lowell v. City of Boston, 111 Mass. 454, 15 Am. Rep. 39. That case involved an issue of bonds to aid in the rebuilding of the portion of Boston that was destroyed in the great fire of November, 1872. The statute authorized the city to issue its bonds for $20,000,000 and out of the fund arising from their sale make loans to parties upon mortgages to aid in restoring the part of the city that had been destroyed. John A. Lowell and nine other taxable inhabitants brought suit to restrain the issuance of the bonds on the ground that the statute was unconstitutional. The Constitution of Massachusetts (part 1, art. 10), like the Fourteenth Amendment of the federal Constitution protects every individual "in the enjoyment of his life, liberty, and property, according to standing laws." The statute was held to violate this provision. The court decided that, however much the public welfare may be promoted by the use of the taxing power, if the *direct* benefits are to the individuals receiving the money and the public benefits are only *indirect*, the use of the taxing power is invalid. It is a striking illustration of the inconsistency of judicial reasoning that at this very time the courts all over the country were sustaining laws authorizing railroad aid bonds amounting to many millions which were given to the private owners of railroads, and the bonds were justified by the courts solely upon the ground that the public received an *indirect* benefit from the building of the railroads.

Returning, now, to Lowell v. Boston. It was decided in 1873, and has been a precedent for many decisions in Massachusetts and in other states condemning uses of the taxing power which were deemed to be for the public welfare. In 1917 the state held a constitutional convention. Its first action was to adopt an amendment sweeping away this decision. In a convention characterized by the conservatism of Massachusetts, the amendment was carried by a vote of 275 to 25, and was adopted by a popular vote of 261,138 to 52,437. This was the first time that the reasoning of Lowell v. Boston was brought to the judgment bar of the people of the state. That decision had stood for more than half a century as an authority supporting scores of decisions nullifying laws to correct evils from which men, women, and children were suffering and furnishing reasons to even more Congresses, Legislatures, and city councils why other laws should not be passed to correct such evils. And now that the real supreme tribunal of Massachusetts, the people of that commonwealth, has swept all these judicial precedents away in that state, what do we say has happened? This:

"The court was right all the time; but the people have now amended their Consitution and granted the Legislature power to do what the court said they could not do before, and so the Legislature may hereafter enact needed laws."

But does that state the whole truth? I think not. Is it not more true to say that the people of Massachusetts have corrected, if not rebuked, the judges of their Supreme Judicial Court. Have they not really said to their judges:

"You have been wrong all this half century. We never intended those general words in the Constitution to mean what you have been saying they

mean, and we wish you would not use them any more to protect practices that have been proven to be economically, morally, and legally unsound (Ives v. South Buffalo Railway Co., 201 N. Y. 271–287, 94 N. E. 431, 34 L. R. A. (N. S.) 162, Ann. Cas. 1912B, 156), and nullify laws passed for their correction."

Is not that the real interpretation of what has happened, not only in Massachusetts, but in the adoption in nearly every state in the Union, during the last 15 years, of constitutional amendments to correct decisions made under the general provisions which forbid a deprivation of life, liberty, and property without due process of law?

(d) No court has been so insistent and emphatic as the Supreme Court of the United States against the abuse of the power to declare laws unconstitutional under the general language of the Fourteenth Amendment.

[7] (1) It has restated the scope of the police power. Prior to 1885 that power was restricted by American courts to the public safety, health, and morals. The Supreme Court holds that it embraces also laws intended to promote public prosperity and general welfare. C., B. & Q. Ry. Co. v. Drainage Board, 200 U. S. 561–592, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175; Chicago & Alton Railway Co. v. Trambarger, 238 U. S. 67–77, 35 Sup. Ct. 678, 59 L. Ed. 1204.

[8] (2) The courts may not concern themselves with the policy of legislation, or its economic wisdom or folly. Those are considerations belonging exclusively to the Legislature. C., B. & Q. Ry. Co. v. McGuire, 219 U. S. 549–569, 31 Sup. Ct. 259, 55 L. Ed. 328; Price v. Illinois, 238 U. S. 446, 451, 452, 35 Sup. Ct. 892, 59 L. Ed. 1400; Rast v. Van Deman & Lewis, 240 U. S. 342, 357, 36 Sup. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Merrick v. Halsey, 242 U. S. 568, 586–588, 37 Sup. Ct. 227, 61 L. Ed. 498.

(3) A law cannot be set aside "because the judiciary may be of the opinion that the act will fail of its purpose, or because it is thought to be an unwise exertion of the authority vested in the legislative branch of the government." McLean v. City of Arkansas, 211 U. S. 539, 547, 548, 29 Sup. Ct. 206, 53 L. Ed. 315; Tanner v. Little, 240 U. S. 369–386, 36 Sup. Ct. 379, 60 L. Ed. 691.

[9, 10] In the light of these established doctrines, let us look at some of the general facts that condition this case.

The people of North Dakota are farmers, many of them pioneers. Their life has been intensely individual. They have never been combined in corporate or other business organizations, to train them in their common interests or promote their general welfare. In the main they have made their purchases and sold their products as individuals. Nearly all their live stock and grain is shipped to terminal markets at St. Paul, Minneapolis, and Duluth. There these products pass into the hands of large commission houses, elevator and milling companies, and live stock concerns. These interests are combined, not only in corporations, chambers of commerce, boards of trade, and interlocking directorates, but in the millions of understandings which arise among men having common interests and living through long terms of years in the daily intercourse of great cities. These common understandings need not be embodied in articles of incorporation or

trust agreements. They may be as intangible as the ancient "powers of the air." But they are as potent in the economic world as those ancient powers were thought to be in the affairs of men. It is the potency of this unity of life of men dwelling together in daily intercourse that has caused all nations thus far to be governed by cities.

As North Dakota has become more thickly settled and the means of intercourse have increased, the evils of the existing marketing system have been better understood. No single factor has contributed as much to that result as the scientific investigation of the state's Agricultural College and the federal experts connected with that institution. That work has been going on for a generation, and has been carried to the homes of the state by extension workers, the press, and the political discussion of repeated political campaigns. The people have thus come to believe that the evils of the existing system consist, not merely in the grading of grain, its weighing, its dockage, the price paid and the disparity between the price of different grades and the flour-producing capacity of the grain. They believe that the evil goes deeper; that the whole system of shipping the raw materials of North Dakota to these foreign terminals is wasteful and hostile to the best interests of the state. They say in substance:

(1) The raw materials of the state ought to be manufactured into commercial products within the state. In no other way can its industrial life be sufficiently diversified to attain a healthy economic development.

(2) The present system prevents diversified farming. The only way that can be built up is to grind the grain in the state which the state produces—keep the by-products of bran and shorts here, and feed them to live stock upon the farms of the state. In no other way can a prosperous live stock, dairy, and poultry industry be built up.

(3) The existing marketing system tends directly to the exhaustion of soil fertility. In no way can soil depletion be prevented, except to feed out to live stock at least as much of the by-products of the grain raised upon the state's farms, as that grain produces when ground, and thus put back into the soil, in the form of enriched manures, the elements which the raising of small grains takes from it.

The present movement began at least as far back as 1911. In that year an amendment of the state Constitution was initiated, authorizing the state to acquire one or more terminal grain elevators and maintain and operate the same in such manner as the legislative assembly should prescribe. That amendment was adopted in 1913. From that time forward the discussion of the subject of marketing the products of the state has been the main theme of public thought. The movement has gone straight forward, the Constitution has been repeatedly amended, including the amendments here assailed—all having for their object the correction of the existing system of marketing the state's products. Year by year the conviction has deepened, in steadily increasing majorities, that public ownership of terminal elevators, mills, and packing houses is the only effective remedy to correct the evils from which they believe themselves to be suffering. Their decision is not a popular whim, but a deliberate conviction, arrived at as a

result of full discussion and repeated presentations of the subject at the polls. The acts which the court is asked to restrain are not those of public officials, who are pursuing enterprises of their own devising. Those acts express not simply the judgment of the state Legislature. To authorize their enactment the people of the state have redrawn their Constitution. That is the highest and most deliberate act of a free people. These constitutional amendments authorize and direct the state to do what the defendants are threatening to do. Their acts are simply the carrying out of the mandate of those constitutional amendments.

It is hopeless to expect a population consisting of farmers scattered over a vast territory as the people of this state are to create any private business system that will change the system now existing. The only means through which the people of the state have had any experience in joint action is their state government. If they may not use that as the common agency through which to combine their capital and carry on such basic industries as elevators, mills, and packing houses, and so fit their products for market and market the same, they must continue to deal as individuals with the vast combinations of these terminal cities, and suffer the injustices that always exist where economic units so different in power have to deal the one with the other.

The foregoing is what a majority of the people of the state have been persuaded to believe by those whose leadership they trust. Whether their grievances are real or fancied, whether their remedies are wise or foolish, are subjects about which the court is not concerned. The only object in trying to set them forth has been to place the constitutional amendments and laws here assailed in their true relationship to the life and thought of the people by whom they were adopted.

The sole question, then, for the court is: Do these acts of the state constitute a violation of the Fourteenth Amendment of the federal Constitution, as that amendment has been construed by the Supreme Court. I think it is clear that they do not. Even if I were in doubt, it would be my duty to sustain the action of the state, for it is only when legislation is plainly and palpably unconstitutional that a court is justified in nullifying it.

The motion of the defendants will therefore be granted, and a decree entered dismissing the bill, with costs.