INVESTMENT RESERVE CORPORATION *v.* MICHIGAN
SECURITIES COMMISSION.

1. CONSTITUTIONAL LAW — STATUTES — BLUE SKY LAW — POLICE
POWER—TITLE SUFFICIENT.

    The so-called blue sky law (Act No. 220, Pub. Acts 1923),
    is well within the police power of the State, and in
    harmony with the purposes of its title.

2. LICENSES—CERTIORARI — PRESUMPTION AGAINST ARBITRARY AC-
TION BY SECURITIES COMMISSION.

    On certiorari to review an order of the securities commis-
    sion denying plaintiff permission to sell investment bonds,
    all presumptions are against wanton or arbitrary action
    by the commission.

3. SAME—DENIAL OF RIGHT TO SELL SECURITIES DOES NOT NECES-
SARILY DEPEND ON FINDING OF ACTIVE FRAUD.

    In arriving at a decision to deny permission to sell in-
    vestment bonds, the securities commission need not neces-
    sarily find the promoters of the project guilty of in-
    tentional dishonesty or active fraud.

4. SAME—ORDER OF COMMISSION SUPPORTED BY SHOWING OF CON-
STRUCTIVE FRAUD SUSTAINED.

    On certiorari to review an order of the securities com-
    mission denying plaintiff permission to sell investment
    bonds, if the record contains evidence tending to support
    its conclusion that said sale would operate as a fraud,
    deception, or imposition upon the public, or the terms of
    sale are so unfair and deceptive as to be constructively
    fraudulent, its order is not to be disturbed, unless the
    evidence is overwhelmingly convincing to the contrary.

5. SAME—WEIGHT SHOULD BE GIVEN TO SPECIAL QUALIFICATIONS
OF SECURITIES COMMISSION.

    In reviewing the conclusion of the securities commission,
    in passing upon the testimony relating to the feasibility
    and fairness of untried financial enterprises, on applica-
    tion for permission to sell securities, some weight is

¹Licenses, 37 C. J. § 164; ²Id., 37 C. J. § 98; ³Id., 37 C. J. §
165 (Anno); ⁴Id., 37 C. J. § 98; ⁵Id., 37 C. J. § 98; 15 A. L. R.
262; 24 A. L. R. 523; 27 A. L. R. 1169; 30 A. L. R. 1331; 40 A.
L. R. 1014.

to be given to the special qualifications and experience of the members of the commission.

6. SAME — ORDER OF COMMISSION SUPPORTED BY EVIDENCE NOT DISTURBED.

The order of the securities commission denying permission to an investment corporation to sell its investment bonds, being supported by the record, is not disturbed, on certiorari.

Certiorari to Michigan Securities Commission. Submitted December 31, 1926. (Docket No. 137.) Decided June 6, 1927.

Application by the Investment Reserve Corporation to the Michigan securities commission for authority to sell investment bonds. From an order denying the application, plaintiff brings certiorari. Affirmed.

*Roy Herald* and *Clark, Emmons, Bryant & Klein,* for appellant.

*Clare Retan* and *William W. Potter,* Attorneys General, and *Fred L. Warner,* Assistant Attorney General, for appellee.

STEERE, J. Plaintiff seeks by writ of certiorari review and reversal of an order made by defendant commission denying its application for authorization under the statute to sell its proposed investment bonds, sometimes called contracts. Return was duly made by defendant, reciting the proceedings had before it and making the exhibits offered a part of its return, admitting its refusal to authorize sale of the proposed bonds, and that the same were rejected for filing. Its final order upon that subject is as follows:

"October 26th, 1926.
"Application C-6482, Investment Reserve Corporation, Detroit, Michigan, was reconsidered. Said application shows:

Licenses, 37 C. J. § 98.

"Non-Par Stock, authorized, 25,000 shs., issued, 25,000 shs.

"After hearing representatives of this corporation who have appeared before the commission upon several occasions; considering the application on file; and considering the report of the insurance department, the contracts of the Investment Reserve Company are hereby rejected for final filing as likely to work a fraud upon the public for the following reasons:

"*First,* it is apparent from the application and testimony that at the time of the purchase of the contracts by the public, there will be no security back of them inasmuch as it is the plan of the company to use the proceeds from the sale of contracts to purchase collateral with which to protect these same contracts; and

"*Second,* changes in the current money rate might at any time bring about a condition making the promised return on the contracts a mathematical impossibility.

"It is further ordered, that a copy of this order be sent to the corporation by registered mail."

Material parts of form of proposed investment contract and application for purchase of bond rejected by the commission are as follows:

"INVESTMENT RESERVE CORPORATION
Detroit, Michigan.

"Please enter my order for one investment bond issued by the Investment Reserve Corporation, of Detroit, Michigan.    Said bond to be for the sum of thirty-six hundred dollars ($3,600) and to mature in 240 months from the date this application is accepted.

"In accordance with the terms and conditions of said bond—I agree to save and to pay to the Investment Reserve Corporation the sum of twenty-four hundred dollars ($2,400) as follows: $10 paid herewith and the balance at the rate of ten dollars ($10) per month on the first day of each month beginning with the months of................. 19...., and continuing until two hundred and thirty-nine monthly payments have been made.

"I am familiar with all the terms and conditions of said investment bond and it is expressly understood and agreed that this application and the terms and con-

ditions of the bond itself constitute the sole evidence of agreement with the corporation and that any statement, made by any agent or other person contrary to, or in addition to, the terms of either, is unauthorized and in no manner binds the corporation.

Date ................... Name ...................
Received $............ Residence ..............
Representative ......... City......... State....
Number                                Dollars
  0000                                3600.00"

"INVESTMENT RESERVE BOND
Advanced Age Fund

"Know all men by these presents that the Investment Reserve Corporation, a corporation organized and existing under and by virtue of the laws of the State of Michigan, hereby promises to pay to........ ..........or, if registered, to the registered owner hereof, at the expiration of two hundred and forty months from date hereof, and upon surrender of this bond—

"Thirty-Six Hundred Dollars

"This bond is secured by investment in mortgage security on improved real estate, or in city, county, State, or United States bonds, or in any other securities authorized by the laws of the State of Michigan, for purchase by savings banks.

"The consideration of this bond is the payment of ten dollars ($10) at the date hereof and a like sum monthly as provided in paragraph No. 2 until a total of twenty-four hundred dollars ($2,400) has been paid to the Investment Reserve Corporation.

"This bond is transferable on the books of the corporation, and is issued, by the corporation, and received and held by the owner, subject to all the terms, conditions and privileges contained herein, which are hereby especially referred to and made a part hereof, as though fully set forth on the face hereof.

"In witness whereof, the Investment Reserve Corporation has caused these presents to be signed in its name and sealed by its corporate seal, at Detroit, Michigan, this........day of..............192....

....................  ....................
        President.                Secretary."

238—Mich.—39.

This is followed by several pages of provisions entitled "TERMS, CONDITIONS and PRIVILEGES" under 12 subheads entitled: Security, Payments, Prepayment Privilege, Delinquent Payments, Loans, Death, Reserves, Paid-up Bonds, Dividend Bonds, Redemption of Bonds, Sale-Transfer or Assignment, and Authority of Agents.

In its articles of incorporation plaintiff states its purpose to be as follows:

"To operate a general investment business; to buy, sell and deal generally in real and personal property of every kind and nature and mortgages or other evidences of indebtedness applying to the same. To loan money and to take, hold and dispose of collateral or other security therefor. To take and hold real and personal property as security for or in payment of loans and debts due or to become due; to make, issue, hold, sell, exchange, transfer or otherwise dispose of notes, bonds, debentures, investment contracts, obligations and evidences of indebtedness of all kinds whether secured by mortgage, pledge, deed of trust or otherwise."

Its total authorized capital stock under its articles of association is 25,000 shares of no par value stock. When the application in question here was filed with the Michigan securities commission and hearing had, it was shown that the entire authorized capital stock had been subscribed by three of the directors and incorporators of said corporation, and paid for by $5,000 in cash in proportion to the amount of the stock issued to each subscriber and $20,000 in demand notes given by said directors in proportion to the amount of their stock.

The validity of this so-called "blue sky law" in its material provisions was sustained by the Supreme Court of the United States in *Merrick* v. *Halsey & Co.*, 242 U. S. 568 (37 Sup. Ct. 227), in passing upon Act No. 46, Pub. Acts 1915 (3 Comp. Laws 1915, § 11945 *et seq.*), which was succeeded by the present

act (Act No. 220, Pub. Acts 1923). That case was decided January 22, 1917, at which time 26 States had legislated along similar lines. That this law is well within the police power of the State and in harmony with the purposes of its title cannot be questioned. Its title states, in part, that its purpose is:

"To prevent fraud, deception and imposition in the issuance, sale or disposition of stocks, bonds and other securities sold or offered for sale within the state of Michigan, and for such purpose to create a commission to regulate and supervise the issuance, sale and disposition of such securities." * * *

Section 7 of the act prohibits, with certain exceptions, selling securities within this State until the same shall have been accepted for filing by the securities commission. Section 12, under which the commission evidently acted in the instant case, provides in part:

"The right to sell securities in this State shall not be granted in any case where it appears to the commission that the sale of such securities would work a fraud, deception or imposition on purchasers or the public, or that the proposed disposal of the securities is on unfair terms." * * *

Defendant's return shows a full and protracted hearing before it upon plaintiff's application, with testimony taken and the project explained in detail by its witnesses. In this review, all presumptions are against wanton or arbitrary action by the commission. As stated in plaintiff's brief:

"The only ground on which the commission may act (in refusal) is 'fraud, deception or imposition on purchasers or the public,' or 'unfair terms' of sale."

In arriving at an adverse ruling, we do not understand it imperative for the commission to find the promoters of the project guilty of intentional dishonesty or active fraud. If this record, taken in its

entirety, contains evidence tending to support the commission's conclusion that sale of these contracts would operate as a fraud, deception, or imposition upon the public, or the proposed terms of sale in connection with the outlined project are so unfair and deceptive as to be constructively fraudulent, its order is not to be disturbed, unless the evidence is found overwhelmingly convincing to the contrary. We cannot so find in this case.

This commission is composed of members appointed for their experience in financial affairs, who are presumed to be familiar with the subject and especially qualified to discern the merits or demerits of such projects, and pass upon the many proposed financial schemes which come before them. Practically no questions of law are involved here. The determination of the commission depends on the facts found by it for which the evidence may give direct or inferential support. Some weight is to be given to the special qualifications and experience of the commission in passing on testimony relating to the feasibility and fairness of such untried financial enterprises as proposed here. Certain things, however, appear in the testimony, which, as a matter of common knowledge, seem to lend support to the conclusions of the commission. Mr. Haines, president and promoter of the company, appeared as a witness and explained to the commission in an appealing manner the practicability of his project to be financed by sale of investment bonds, and the merits of the bonds which it proposed to sell the public for that purpose. His testimony as a whole is persuasive that he would prove a successful salesman of such bonds amongst the class to whom he proposes to sell them. He testified of his new plan to help the wage earner save, in part, as follows:

"*Q.* Then you take the public's money and buy mortgages and put the mortgages in a pot?
"*A.* Yes, sir.

"*Q.* Aren't you getting dangerously close to the banking business there?

"*A.* I don't think so, not at all.

"*Q.* Where does the company make its money?

"*A.* The company makes its money on the overplus of the earned interest on the investments at the end of the period of time.

"*Q.* There has been $25,000 put in here?

"*A.* Yes, sir.

"*Q.* $5,000 in cash and $20,000 in notes?

"*A.* Yes. All the rest is available any time when we get started.

"*Q.* Where did you get this scheme?

"*A.* This scheme, so-called, really originated by myself about two years ago in trying to find some way of investing small amounts of money which I can do without feeling it. I started to look for it myself and gradually evolved the scheme if I couldn't find such a scheme, why wasn't there a way of doing it? * * *

"*Q.* Couldn't you find any place where you could buy bonds on time?

"*A.* There is no place that I know of where bonds can be purchased on a basis of a small payment each month.

"*Q.* If you could find such a place, you wouldn't be interested in this, would you?

"*A.* Yes, I would."

He also stated that the moving idea of his scheme was to enable a man to invest and save small amounts of money which "he doesn't save at the present time, and give him a good return for his money and absolutely insure an estate for him in his after years." Among other things he was asked and answered:

"*Q.* What you want to do now is sell these bonds, isn't it?

"*A.* Yes, sir.

"*Q.* You say they are secured by mortgages or other collateral?

"*A.* Yes, sir.

"*Q.* Where is that collateral now?

"*A.* There is no collateral now. There will be when they are sold. * * *

"*Q.* Now, Mr. Haines, bring them in and put them up as collateral and we might let you issue bonds but to let you go out and issue bonds first and put the collateral up when you get ready—

"*A.* If we were taking the man's money for the bond before we put the collateral up, but we are not. When we take his money, we put up the collateral at the same time.    We have got money to buy the collateral as soon as we have an obligation of the man that buys the bond."

A witness named Herald, who seemed to have gone into the subject quite fully and apparently testified as an expert, explained plausibly how, under statistics furnished by actuaries, the scheme would work out so that during a 20-year period a man would pay in $2,400 in $10 monthly payments and at the expiration of the time draw out $3,600.    Among other things he was asked and answered:

"*Q.* What does this mean here?    The fifth paragraph, I think it is.    'Out of the payments made the first year only, the sum of eighty dollars is deducted and used by the company to cover its expenses,' etc. Out of what is the $80 taken?

"*A.* It is taken out of the $120 to cover the selling expense, the heavy expense you will naturally have the first year.

"*Q.* So that out of every $120 that a man pays in the first year, the company deducts $80?

"*A.* Yes.

"*Q.* Leaving only $40 to be invested?

"*A.* That is right, and his reserve value is $36 the first year because it from necessity has to be lower.

"*Q.* Then continuing the next five years, they deduct $5 from every $120?

"*A.* That is right.

"*Q.* And then $2?

"*A.* Yes.

"*Q.* Is there any specified length of time of the investment contracts?

"*A.* The investment contract is for 20 years but there is a provision made that at the end of two years he can get a loan or at the end of six years, he can

take a paid-up bond or, in case of death, his estate can go on with the contract or they can cancel it and take a withdrawal at the rate of four per cent. interest. \* \* \*

"*Q.* Let me ask you a little more about the $80 deduction. Suppose the man deposits his $120 and in two years or at the end of this year, we will put it, at the end of the first year he concludes that he can't go along with the payments. He has $40 in that investment so that you grab out of the poor fellow $80 the first year. What provision are you making to protect his investment of $120?

"*A.* You are making a provision of $36 reserve the first year. Page three gives you a table. $36 reserve the first year.

"*Q.* And that $36 is taken out of his $40?

"*A.* It is taken out of his $120.

"*Q.* First of all, out of the $120 you are taking $80. That leaves him $40. Then out of the $40, you take $36, and put it in a reserve for him.

"*A.* That is right.

"*Q.* What do you do with the other $4?

"*A.* It goes into the treasury of the corporation to produce some fund to do business on.

"*Q.* So the $4 is used for any excess expense that might come to the company; so the fact is that you are taking out of him $84 to run the company?

"*A.* If you wish to take it that way, that is exactly what they are doing. \* \* \*

"*Q.* The company takes that money and buys securities with it?

"*A.* Yes.

"*Q.* On the sole judgment of the company itself?

"*A.* On the judgment of the directors. \* \* \*

"*Q.* You say to the poorer man who can't lay down $100 or $500 or $1,000 for a bond, you say, 'Give us your money in monthly installments and we will invest it sure for you and when you have paid $2,400, we will pay you $3,600?'

"*A.* Yes.

"*Q.* And the $1,200 profit is something upon which you have no actual operations of any company to base your figures on?

"*A.* That is true.

"*Q*. The only thing you have is statements from highly respected and men of great reputations?

"*A*. That is right.     *     *     *

"*Q*. Then the whole thing rests upon the judgment of these men and they are going to set themselves up as being able to promote a plan, which used as a basis of return, will pay $3,600 for $2,400?

"*A*. Surely."

The rate of interest plaintiff plans to realize on the investment of installment money payments by the purchasers of 20-year bonds is figured at $5\frac{1}{2}$ per cent. proposed to be compounded semi-annually.    Much stress is laid upon the reports of an expert consulting actuary and a firm of certified public accountants showing by actual figures that the estimates made by plaintiff will result as claimed on the basis that during the entire 20 years $5\frac{1}{2}$ per cent. interest will be realized and there will be no losses or other complications militating against the computation.    This theoretical mathematical solution of the scheme does not relieve the proposed contract bonds of their unfair features, or the elements of uncertainty, potentially constructive fraud and imposition on the public found by the commission.

Its order is not without evidential support, and we find no occasion to disturb the same.    It will, accordingly, stand affirmed.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.